JOSEPH F. PARKINS, APPELLEE, V. MISSOURI PACIFIC
RAILWAY COMPANY, APPELLANT.

FILED MARCH 22, 1906.  No. 14,361.

1. **Pleadings:** CONSTRUCTION.  Where a party fails to test the sufficiency of a petition by demurrer, but answers to the merits and proceeds to trial on the theory that it tenders a certain issue, which is litigated and submitted to the jury, if by any reasonable construction of the language the pleadings can be construed to raise such issue they will be held to do so.

2. **Sales:** TENDER: EVIDENCE.  Evidence examined, and *held* sufficient to sustain a finding that the commodity which the plaintiff was able, ready and willing to deliver in pursuance of a contract of sale answered the requirements of such contract.

3. ———: ACTION: BURDEN OF PROOF.  In an action for breach of contract for refusal on the part of the vendee to accept the goods tendered, the burden of proof that the goods tendered met the requirements of the contract is upon the plaintiff.

4. ———: REFUSAL TO ACCEPT.  Where the goods tendered do not meet such requirements, the vendee may refuse to accept them, and is not required to assign any ground for his refusal.

5. **Estoppel:** BURDEN OF PROOF.  Where a party pleads and relies on an estoppel, the burden of proof is upon him to establish the facts upon which the estoppel is based.

6. **Measure of Damages.**  In an action for breach of contract of sale for refusal on the part of vendee to accept the goods, where the vendor procures the goods from third parties, the measure of damages is the difference between the cost at which plaintiff could have procured and delivered the goods at the time and place specified by the contract and the contract price, with interest from the date of the accrual of the action.  *Wittenberg v. Mollyneaux*, 59 Neb. 203, denying the right to interest for breach of contract, modified.

7. **Nominal Damages.**  In such cases, the computation must be based upon data furnished by the pleadings and the evidence, and if they fail to furnish such data no recovery can be had beyond nominal damages.

APPEAL from the district court for Sarpy county: ALEXANDER C. TROUP, JUDGE.  *Reversed.*

*John F. Stout, James W. Orr* and *B. P. Waggener,* for appellant.

*F. T. Ransom, Weaver & Giller. H. Z. Wedgwood* and *W. R. Patrick, contra.*

ALBERT, C.

This is the second time a judgment in this case has been presented to this court for review. See *Parkins v. Missouri P. R. Co.,* 4 Neb. (Unof.) 1, 13; 72 Neb. 831. For convenience we reiterate so much of the former statement of facts as may be necessary to understand the discussion which follows. On the 5th day of October 1892, the parties entered into a contract in writing as follows: "This agreement made this 5th day of October, A. D. 1892, by and between the Missouri Pacific Railway Company, party of the first part, and Joseph F. Parkins, lessee of the Springfield Gravel Company, party of the second part, Witnesseth: That the said party of the second part agrees to deliver to the party of the first part, in such amounts as may be designated from time to time by said party of the first part, 50,000 yards, cubic measure, of good, clean, marketable gravel, such as shall be in the judgment of the superintendent of the said party of the first part suitable for ballasting the roadbed of said party of the first part, to be delivered on board cars and measured on the cars by the party appointed by the said Missouri Pacific Railway Company to receive the same; the said gravel to be delivered in two years from this date, but times and amounts of delivery of gravel within such period to be determined by the party of the first part as it shall need the same from time to time. In consideration of the premises, the said party of the first part agrees to pay for said gravel 45 cents a cubic yard delivered on the cars as aforesaid, the payments to be made monthly for the gravel furnished during the preceding month. In witness whereof the parties hereto have set their hands this 5th day of October, 1892."

In pursuance of this contract the plaintiff in 1892 delivered to the defendant about 2,000, and in 1893 about 14,000, cubic yards of gravel, and in subsequent years a quantity sufficient to make the total amount delivered 21,-816 cubic yards. None of the gravel delivered in 1892 was used for ballast, and of that delivered in 1893 only about 15 per cent. was used for that purpose. But the whole amount delivered in 1894, and it would seem at least a portion of that delivered in 1895, was used for ballasting the defendant's roadbed. In June, 1894, in response to plaintiff's request to take more of the gravel, the defendant placed its refusal on the ground of a lack of coal, owing to a strike then prevailing among the coal mines in certain localities. In the following September it refused a like request on the ground of the then prevailing business depression, and suggested an extension of the contract for another year. A few days later it renewed its refusal on the same ground, and agreed to extend the contract for another year, and by virtue of such extension the contract was extended to October 5, 1895. In the spring of 1895 the plaintiff again urged the defendant to take more of the gravel, and in response was informed that the defendant had not yet decided how much ballast it could take for use in that year, but that it would not be able to take very much, for the reason "that this company, in line with all others, has got to keep pretty close to shore on account of decreased earnings." The testimony of the plaintiff tends to show that the defendant at no time during the life of the contract, as extended, objected to receiving the remainder of the gravel on any ground other than those just mentioned. On the other hand, evidence adduced by the defendant tends to show that the gravel was unsuitable, both in fact and in the judgment of its superintendent, for ballasting its roadbed; that it made complaint of the gravel on those grounds to the plaintiff in the latter part of 1894 or early in 1895, and early in the summer of the latter year on the same grounds refused to accept the remainder of the gravel, and notified the plaintiff, not only of such

refusal, but of the grounds upon which it was based.    After this notice is claimed to have been given, the defendant ordered more of the gravel, but it was not used for ballast, but appears to have been taken under the contract.    Some appears to have been taken as late as 1898.    The defendant having refused to accept the remainder of the 50,000 cubic yards of gravel, the plaintiff in 1899 brought this action, assigning the defendant's refusal to take the remainder of the gravel as a breach of the contract and asking damages.

In his amended petition the plaintiff sets forth the terms of his contract with the defendant and the extension thereof for one year, the quantity of gravel he furnished the defendant thereunder, including that furnished after the time the contract had expired by the terms of the extension, payment for the quantity of gravel furnished and the refusal of the defendant to accept the remainder of the 50,000 yards under the contract.    The petition also contains the following averments:    "Plaintiff says that the gravel furnished, and received and paid for by defendant under the terms of said contract as aforesaid was all of the same kind and quality and was all accepted and received by defendant under the terms of said contract and was used by the defendant for the purpose of ballasting its roadbed, and was acceptable and suitable in the judgment of its superintendent for that purpose.    Plaintiff further states that he was at all times during the period provided for the delivery and acceptance of said gravel, and the extension of the time of the delivery of the same, ready, willing and able to furnish to the defendant the remainder of said gravel, to wit, 30,000 cubic yards of the same kind and quality as provided for in said contract, and as was delivered and accepted by the defendant in the 20,000 yards hereinbefore mentioned as having been delivered and accepted by defendant."    The damages are laid at $9,000.

The answer admits the execution of the contract; that defendant received a certain quantity of the gravel thereunder and paid for the same, and denies all allegations not admitted.    Among other affirmative allegations in the an-

swer are the following: "That it was imposible to deter-
mine, without using the same, whether the gravel fur-
nished by plaintiff was suitable for ballasting the roadbed
of defendant company, and for that purpose a portion of
such gravel was received, used and paid for, to the extent
taken; that after using the same it became evident, and it
was the judgment and opinion of the superintendent of this
defendant company, that the gravel furnished by the plain-
tiff was not suitable for ballasting defendant's roadbed,
and was not in accordance with the contract made between
the parties, and said plaintiff was notified that the gravel
furnished by him was not, in the judgment of the defend-
ant's superintendent, suitable for ballasting the roadbed of
this defendant, and that no more of such gravel would be
taken or used for such purpose, and the gravel so furnished
by said plaintiff was, as a matter of fact, unfit and un-
suitable for the purpose for which the same was contracted
to be purchased, and said plaintiff was so informed, and
the contract was terminated; that under the terms and
conditions of said agreement the superintendent of defend-
ant company was made the sole judge as to the gravel be-
ing fit and suitable for the purpose of ballasting defend-
ant's roadbed."

Among other things the reply contains the following:
"And, further replying to said answer, alleges that under
the terms of such contract and in accordance therewith the
plaintiff delivered to the defendant the 21,816 yards of
gravel hereinbefore mentioned under said contract, which
the defendant received, accepted and paid for as provided
by the contract. That during the time for the delivery of
the gravel under said contract the plaintiff demanded of
defendant that it take and pay for the remainder of the
gravel, and the defendant refused so to do, and assigned
and asserted at the time as the only reason for such refusal
that it was impossible for the defendant to take the re-
mainder of the gravel under said contract on account of
the dearth of coal for engine use on defendant's railway,
the financial panic existing at the time, and decreased

earnings of defendant's railway;  *  *  *  that by reason
of such conduct and attitude of the defendant the said de-
fendant is estopped now to assert, or claim, or plead as a
defense to plaintiff's said action that it refused to receive
said gravel for the reason that said gravel was not suitable,
in the judgment of the superintendent of defendant, for
ballasting defendant's roadbed, or to assign, assert or plead
any other reason than the said asserted and assigned rea-
sons for its refusal to receive the remainder of said gravel
called for in said contract."

A trial resulted in a verdict and judgment for the plain-
tiff in the sum of $11,220.65, and defendant appeals.

It is first contended that the petition upon which the
cause was submitted does not state facts sufficient to consti-
tute a cause of action. This contention is based in part upon
a construction which the defendant insists should be
placed upon the contract in suit. Such construction is
that the contract did not bind the defendant to take 50,000
cubic yards of gravel, even though the gravel offered an-
swered all the requirements of the contract, but only such
quantity and at such times as might be determined by the
defendant itself. We do not think the contract admits of
this construction. Thus construed the contract practically
would leave it optional with the defendant whether to take
any of the gravel, and, to that extent, the contract would
be unilateral and binding on neither party. The contract
expressly provides for the delivery of 50,000 cubic yards of
gravel within two years. The clauses, "such amounts as
may be designated from time to time by said party of the
first part," and, "but times and amounts of delivery of
gravel within such period (two years), to be determined
by the party of the first part as it shall need the same from
time to time," are not to be taken as giving the defendant
an option to take none of the gravel, or only such portion
of the 50,000 yards as it might see fit to take, but merely as
providing for a delivery of the entire 50,000 yards by in-
stalments, and to enable the defendant to accommodate
the delivery of the instalments to its requirements.

It is also contended that there is no averment in the petition to the effect that the remainder of the 50,000 yards of gravel, which the defendant stood ready and willing to deliver under the contract, was suitable, in the judgment of the defendant's superintendent, for ballasting its roadbed. We have set out that portion of the petition relied on as covering this ground. It shows that the gravel actually furnished the defendant under the contract was of the quality specified in the contract, and suitable, in the judgment of the superintendent, for ballasting the defendant's roadbed. Then follows the allegation to the effect that the remainder of the 50,000 yards of gravel, which plaintiff was ready and willing to furnish, was of the same kind and quality as provided in the contract, and "as was delivered and accepted by the defendant in the 20,000 yards hereinbefore mentioned as having been delivered and accepted by the defendant." The petition upon which the cause was submitted the second time stands just as it stood when the first trial was had. Before answering, the defendant filed a special, as well as a general, demurrer, but withdrew both before a ruling was had thereon, and answered. At both the first and the second trial one of the principal questions litigated was whether the gravel had been approved by the defendant's superintendent, and it appears from the evidence adduced, and instructions respectively tendered by the parties, that they, as well as the court, proceeded on the theory that the pleadings presented that issue. Where a party fails to test the sufficiency of a petition by demurrer, but answers to the merits and proceeds to trial on the theory that the petition tenders a certain issue, and such issue is litigated, if by any reasonable construction of the language the pleadings can be construed to raise that issue they will be held to do so. This is only another way of saying that this court will, when possible, adopt a construction of the pleadings in which the parties themselves have concurred. Tested by this rule, the petition tenders the issue in question.

Another question raised is whether the verdict is sus-

tained by sufficient evidence, the defendant contending that there is a total lack of evidence tending to show that the remainder of the 50,000 cubic yards, which the plaintiff was ready to furnish, was suitable, in the judgment of the defendant's superintendent, for ballasting its roadbed. To appreciate the force of this contention it should be kept in mind that the defendant expressly stipulated in the contract for gravel suitable in the judgment of its superintendent, for ballasting its roadbed, and that the plaintiff, instead of attempting to allege and prove that the gravel was in fact suitable for such purpose, and that the approval of the superintendent was capriciously or arbitrarily withheld, or any other facts that would excuse a showing of such approval, placed himself squarely upon the proposition that the remainder of the gravel was suitable, in the judgment of defendant's superintendent, for the purpose specified. We think the evidence is sufficient to sustain a finding in favor of the plaintiff upon that point. It is true there is no evidence that the superintendent ever expressly gave it as his opinion that the gravel was suitable for ballast. On the contrary, the evidence of the superintendent himself is to the effect that the suitability of the gravel for that purpose could only be determined after an actual test, and that late in 1894, or early in 1895, he reached the conclusion, after such test, that the gravel would not answer that purpose. Besides, there is a large amount of expert testimony to the effect that the gravel was in fact unsuitable for ballast. But opposed to all such evidence are the facts that the defendant accepted a large portion of the gravel in instalments and during the life of the contract, and that a considerable portion of the gravel thus accepted was used for ballast and was put to such use by the superintendent or under his orders. These facts, coupled with the further fact, which the testimony of the plaintiff tends to establish, that during the life of the contract the defendant's refusals to accept the remainder of the gravel were based exclusively on other grounds, reasonably warrant the inference that the superintendent considered the gravel

suitable for the purpose for which it was intended by the terms of the contract.

The defendant, in this connection, claims that its contract with the plaintiff was made with reference to what is known as the Springfield Gravel Company pit, and with the understanding that the gravel delivered under the contract should be taken from that pit, and that contrary to such understanding a portion of the gravel delivered prior to 1894 was taken from what is known as the Union Pacific or Birkhauser pit. Should it be conceded that the parties contracted with reference to the Springfield Gravel Company pit, defendant's complaint that a portion of the gravel was taken from another pit is unavailing at this time. There are two Union Pacific pits, the old and the new. The gravel in the old pit appears to be inferior, while that in the new seems to be at least equal to that in the Springfield pit. The gravel furnished by the plaintiff, aside from what was taken from the Springfield pit, was all taken from the new Union Pacific pit. It was taken from that pit with the defendant's full knowledge, and was never objected to on that ground. In fact, when the contract in suit was extended, it was at the defendant's suggestion that plaintiff procured an extension of his lease of the Union Pacific pit in order that he might continue to furnish defendant gravel therefrom if he saw fit. It would seem, therefore, that defendant's complaint that a portion of the gravel was taken from the Union Pacific pit has no just foundation.

After stating the substance of the petition, answer and reply at some length the court gave the jury this instruction: "You are instructed that the burden of proof is upon the plaintiff in this case to show by a preponderance of the evidence all the material allegations in his petition which are denied in the defendant's answer, before he can recover; that is to say: (1) That the plaintiff must thus prove that he was able, ready and willing to furnish to defendant under the terms of the contract between said parties the remainder of the 50,000 cubic yards of gravel

not delivered; (2) That the same was good, clean, marketable gravel, and, in the judgment of defendant's superintendent, suitable for ballasting the roadbed of defendant company; (3) that he has sustained damages in some amount by reason of the failure of the defendant to accept the remainder of said gravel, and that such damages have not been paid. Likewise, the burden of proof is upon the defendant to establish by a preponderance of the evidence all the material allegations of new matter contained in its answer, which are denied in plaintiff's reply; that is to say: (1) The defendant must prove that it objected and refused to take the remainder of the gravel under said contract for the reason that the same was not good, clean, marketable gravel or, in the judgment of the defendant's superintendent, not suitable for ballasting the roadbed of defendant company; and (2) that it so notified plaintiff prior to October 5, 1895."

In another paragraph of the charge, after presenting plaintiff's theory of the case, the court used this language: "But if, on the other hand, you believe from all the evidence in the case that that portion of the gravel which was delivered to and accepted by the defendant was not good, clean, marketable gravel, or was not, in the judgment of defendant's superintendent * * * suitable for ballasting the roadbed of defendant company as provided in said contract, and that the defendant refused to take any more of said gravel for that reason, and you should further find that the defendant so notified plaintiff prior to October 5, 1895, then said contract would be thereby terminated, and your verdict should be for the defendant."

These instructions taken together may be reduced to this proposition: That, although the remainder of the gravel which the plaintiff was able, ready and willing to furnish, did not meet the requirements of the contract, the plaintiff, nevertheless, would be entitled to a verdict, unless the defendant had shown by a preponderance of the evidence that it had based its refusal to accept the gravel on that ground, and he had so notified the plaintiff prior to

October 5, 1895. These instructions were intended to cover both the plaintiff's theories, namely, that the remainder of the gravel was suitable in the judgment of the defendant's superintendent, for ballasting its roadbed, and that the defendant, by basing its refusal on other grounds, is estopped to deny that it was thus suitable. As to the former theory, the plaintiff now disclaims any attempt to show that the approval of the superintendent was arbitrarily or capriciously withheld, but places himself squarely on the proposition that the gravel was suitable, in the superintendent's judgment, for that purpose. Consequently, in order to show a breach of the contract, the burden of proof was upon him to show that the gravel answered that requirement of the contract. If it did not answer that requirement then the tender of such gravel, or what amounts to a tender, was not a tender of performance on his part of the contract, and the defendant had a right to refuse it, and was not required to give any reason for its refusal. Consequently, an instruction which required the defendant to show that it had based its refusal on a specific ground, and given notice to the plaintiff of the ground on which its refusal was based is erroneous.

The theory of estoppel is presented by that portion of the reply heretofore set out, and, as to such theory, the court appears to have been of the opinion that, if the remainder of the gravel was of the same quality as that which had been accepted and paid for by the defendant under the contract from time to time, and the defendant had placed its refusal to accept the remainder on the ground of a scarcity of coal or money, or upon any other ground than that it was not of the quality called for by the contract, or was unsuitable, in the opinion of its superintendent, for ballast, and continued to place its refusal on such ground until after the expiration of the contract, it would not be permitted to shift its ground after the contract had terminated. Assuming that such acts on the part of the defendant would give rise to an estoppel, the burden of establishing the facts constituting the estoppel

would rest upon the plaintiff. One of those facts is that
the defendant's refusal was based exclusively on grounds
other than that the gravel did not answer the requirements
of the contract, or was unsuitable, in the judgment of the
superintendent for ballast. And no matter how strong a
*prima facie* case the plaintiff may have, made on the ques-
tion of estoppel, the burden of proof never shifted to the
defendant, but remained with the plaintiff to the end of
the trial. That being true, an instruction, or set of in-
structions, which required the defendant to show by a pre-
ponderance of the evidence that its refusal to take the re-
mainder of the gravel was not based exclusively on matters
outside the contract, and that it so notified the plaintiff, is
erroneous.

It appears in evidence that on the day the plaintiff con-
cluded to contract with the defendant, he procured a lease
for two years of the Springfield Gravel Company pit, by
the terms of which he was to pay his lessor 30 cents a yard
for all screened, and 25 cents a yard for all unscreened
gravel "sold, loaded and shipped" from this pit by the
plaintiff during the life of the lease. Later the plaintiff
leased the Union Pacific or Birkhauser pit, paying $250 for
the privilege of taking gravel therefrom in such quantities
as he saw fit for a term ending September 1, 1893. Both
leases were afterwards extended to meet the extension of
the contract in suit; the first on the original terms, the
second without any further consideration. It also appears
that the plaintiff was under a contract in writing with
another party, whereby such other party was to take the
gravel from the Springfield pit and load it on the de-
fendant's cars, according to the contract in suit, for 15
cents a yard. But in addition to plaintiff's undertaking to
pay 15 cents for such services, the contract contained the
following: "All expenses of measuring and weighing to be
paid for by the party of the first part (plaintiff). The
party of the first part agrees to furnish all material at the
pit for building and repairing all traps required by the
party of the second part for the convenient and rapid load-

ing of the gravel; to furnish the use of boarding house, stables, blacksmith shops and tools, without expense to party of the second part while performing the above described work and to be paid by days wages for all cleaning up of the gravel pit and all extra work done and to keep the railway track in good repair, so that cars can easily be moved on the same. And the said party of the first part agrees to pay the said party of the second part for all loss of time while waiting for cars, and for all repair of tracks for material to build or repair track, and for all damages for the cancelation of this contract before there are 2,000 cars of gravel loaded." There is no evidence upon which to base an estimate of what it would have cost the plaintiff or what it would have been reasonably worth to comply with the foregoing provisions. There is testimony tending to show that the reasonable cost of taking the gravel from the Union Pacific or Birkhauser pit, and delivering it on board defendant's cars, to the place plaintiff was required to deliver it, would have been about 20 cents a yard. But whether this included the additional expenses contemplated by that portion of the contract for loading gravel just quoted is not quite clear. There is no evidence as to the value of the services of the plaintiff in superintending or overseeing the carrying out of his contract with the defendant.

On this state of the record the court gave two instructions as to the measure of damages. They are substantially the same in principle and one is as follows: "You are instructed that uncontroverted evidence in this case shows that there were delivered by the plaintiff to the defendant under the contract sued on 21,816 yards of gravel, and that amount was received and paid for by the defendant. Now, if you find for the plaintiff, you will determine from the evidence the amount of plaintiff's damages in the following manner: You will determine from the evidence what it would have cost the plaintiff to have furnished and delivered to the defendant within the time limited in the contract the remainder of 50,000 cubic yards of gravel con-

tracted for, and, if you find such cost would have been less than the contract price between plaintiff and defendant under said contract, you will deduct such cost of furnishing and delivering the gravel from the contract price; upon this difference between the cost and contract price you will calculate simple interest at the rate of 7 per cent. per annum from October 5, 1895, to the 6th day of March, 1905, that being the first day of the present term of this court, and this interest you will add to the difference between the contract price and the cost price, and the sum resulting therefrom will be the amount of damages you should return in favor of the plaintiff." Aside from the matter of interest, which we shall notice presently, we think the instruction correctly states the rule for the measure of damages in cases of this character. In such cases—that is, in cases where the plaintiff procures the commodity to be furnished from third parties—upon the vendee's wrongful refusal to accept the goods, the measure of damages is the difference between the agreed price and what it would cost the plaintiff to procure and deliver the goods according to the terms of the contract. 3 Sutherland, Damages (3d ed.), sec. 648; *Allen v. Murray,* 87 Wis. 41; *Danforth v. Walker,* 37 Vt. 239. But it would seem that the evidence is not sufficiently clear to admit of an application of the rule in this instance. From what has already been said it appears that, while the price at which the plaintiff procured, or might have procured, the gravel at the pits is sufficiently clear, its delivery to the defendant would have involved elements of expense which cannot be computed from the data furnished by the record.

It is contended that the instruction under consideration is erroneous, in that it directed the jury to allow interest on whatever damages they found. Whether interest is allowable in an action for unliquidated damages is a question upon which the courts of this country are not in accord, and upon which the decisions of the same court are frequently in conflict. In regard to interest in actions for breach of contract under the title of "Damages," in 13 Cyc.

p. 85, it is said: "The decisions are very conflicting as to the allowance of interest by way of damages in cases of breach of contract, unless the rate or amount is fixed in the contract itself. The allowance of interest in such cases was formerly a question somewhat within the discretion of the jury; but it is now considered more a question of law for the court. The better rule on this subject seems to be that such interest as damages will be allowed, especially where the damages are capable of being definitely ascertained." See authorities there cited.

Many of the authorities denying interest in such cases merely hold against the allowance of interest *eo nomine,* leaving it inferable that the jury might include interest in the general award of damages. Other cases, disallowing interest, appear to proceed on the theory that damages are awarded in part, at least, as a punishment against the wrongdoer, and that, so long as the damages are uncertain and ascertainable only by verdict, it would be unjust to allow interest. Another line of decisions appear to be based on the provisions of local statutes with respect to interest, in that such statutes do not contemplate the allowance of interest, on unliquidated claims. But it would be a hopeless task to attempt to analyze the decisions on this question or to classify them according to fixed principles. We can only say with the author above quoted: "The better rule on this subject seems to be that such interest as damages will be allowed, especially where the damages are capable of being definitely ascertained." In reaching this conclusion we have not overlooked *Wittenberg v. Mollyneaux,* 59 Neb. 203, where the court announced this doctrine:

"If the right to damages for breach of a contract is matter of reasonable litigation, and the amount to be recovered, if any, is unliquidated and must be fixed, not by mere computation but by suit, interest may not be allowed for time precedent to the settlement of the right to a recovery and the ascertainment of the amount."

In support of that rule the court in that case cited,

*Shipman v. State*, 44 Wis. 458; *Vietti v. Nesbitt*, 22 Nev. 390, 41 Pac. 151; *Swinnerton v. Argonaut L. & D. Co.*, 112 Cal. 375, 44 Pac. 719; 2 Sutherland, Damages (3d ed.), sec. 347; *Pacific Postal T. C. Co. v. Fleischner*, 66 Fed. 899; *Hooper v. Patterson*, 32 Pac. (Cal.) 514.

As to the Wisconsin case, the rule as there announced is not in harmony with some of the former, as well as some of the later, cases of that court. *Hinckley v. Beckwith*, 13 Wis. 34, was an action for breach of contract, and the court held that the allowance of interest was discretionary with the jury. The theory that interest is a matter of discretion with the jury is examined and repudiated in *Dana v. Fiedler*, 12 N. Y. 40, 62 Am. Dec. 130, the court holding that it was allowable as a matter of law. A later Wisconsin case, *Allen v. Murray, supra*, was also an action for breach of contract, and the court approved an instruction permitting the jury to allow interest, following *Hinckley v. Beckwith, supra*. The Nevada case was an action to recover the amount due on a contract, and interest was disallowed because the claim did not fall within the provisions of the statute of that state allowing interest. The court, however, there recognize the rule of allowing interest in actions for damages, merely as damages. The California case is based on a line of decisions of that state, one of which is *Cox v. McLaughlin*, 76 Cal. 60, 18 Pac. 100. In that case, the court quotes 2 Sutherland, Damages (3d ed.), sec. 347, where, after laying down the rule that interest is not allowable on unliquidated claims, the author adds: "The allowance of interest as damages is not dependent on this rigid test." In *Brady v. Wilcoxson*, 44 Cal. 239, the court, although denying the right of interest on an unliquidated claim prior to judgment said: "On such demands, interest, *eo nomine*, cannot be allowed."

It would seem, then, that the rule in *Wittenberg v. Mollyneaux, supra*, while supported by the single Wisconsin case it cites, is in conflict with both the previous and subsequent holdings of that court, and that the other authorities it cites as supporting the rule recognize the

20

right to allow interest in actions sounding in damages, not, however, as interest, but merely as a part of the damages. The practical value of the distinction is not quite clear.

It seems to us that the case at bar, in itself, furnishes a strong argument for the abandonment of the rule announced in *Wittenberg v. Mollyneaux, supra.* Had the contract been carried out, as extended, plaintiff would have completed the delivery of the 50,000 yards of gravel by October 5, 1895, and the breach occurred, if there was a breach, not later than that date. Plaintiff's right to compensation in the way of damages accrued at that time, and the amount then required to compensate him for a loss sustained by the breach would have been, as we have seen, the difference between what it would have cost him to procure and deliver the balance of the gravel and the agreed price. Every day payment was deferred enhanced the damages to the extent of the value of the use of the money. The suit was begun in October, 1899, and was not finally tried until the March term, 1905, of the district court. In other words, at the time this case was finally submitted the money which would have been required to compensate the plaintiff when his cause of action arose had been withheld from him for almost ten years. The fundamental idea lying at the root of the whole doctrine of damages in this jurisdiction is compensation. Punishment of the wrongdoer has no place in the doctrine. The purpose of the law is to make the condition of the party aggrieved, as nearly as may be, what it would have been had the contract been performed. In other words, to see that the plaintiff suffers no loss in money or property by reason of the breach of his contract. It is no answer to the claim for interest, as part of the amount required to make good his loss, to say that the amount required to compensate him was unascertained and could only be ascertained by verdict, and, consequently, the defendant was unable to make a tender of the amount, because that very uncertainty is one of the consequences of

the defendant's own wrong, and, if loss must fall upon one or the other by reason of such uncertainty, it is but just that it should fall on the wrongdoer, rather than upon his victim. Neither does the statute stand in the way of the allowance of interest as damages in such cases. The interest is a part of the damages sustained, and it is wholly immaterial by what name the specific item of damages is designated. But whatever damages are allowed, and by whatever name they are called, they are allowed as compensation, and any scheme of compensation, whereby it is sought to place the plaintiff in as favorable a position as he would have occupied had the contract been performed, that does not take into account the value of the use of the money for the time it has been withheld subsequent to the accrual of the action is obviously defective and inadequate.

We do not wish to be understood as holding that interest is recoverable in all actions sounding in damages. It is not necessary to go to that length in this case. No doubt a distinction may be drawn between actions for damages for assault, libel, alienation of affections, breach of promise to marry, and the like, where the damages, of necessity, are more or less within the discretion of the jury, and those where they are mathematically computed from data furnished by the evidence. This case falls within the latter class, and we think the true measure of damages is the difference between what it would have cost the plaintiff to procure and furnish the gravel according to contract and the contract price, plus the interest on such difference from the accrual of the action. If we are correct thus far, then the case of *Wittenberg v. Mollyneaux, supra,* to the extent that it conflicts with the views here expressed, should be overruled. In that event, there is no error in the instruction of the trial court on the subject of interest of which the defendant may justly complain.

Other errors are assigned and discussed. Some of them relate to questions already considered, the others to such

as are not likely to arise in their present form at another trial, so it would be unprofitable to extend this opinion to greater length.

For the errors pointed out, it is recommended that the judgment of the district court be reversed and the cause remanded for further proceedings.

DUFFIE and JACKSON, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is reversed and the cause remanded for further proceedings.

REVERSED.