KEYSTONE RANCH COMPANY, A CORPORATION, APPELLEE AND
CROSS-APPELLANT, V. CENTRAL NEBRASKA PUBLIC POWER AND
IRRIGATION DISTRICT, APPELLANT AND CROSS-APPELLEE,
NEBRASKA PUBLIC POWER DISTRICT, APPELLEE AND
CROSS-APPELLEE.

465 N.W.2d 472

Filed February 8, 1991.   No. 88-408.

Michael C. Klein and Bruce A. Peterson, of Anderson, Klein, Peterson and Swan, for appellant.

James E. Schneider, of Schneider & Griffin, P.C., for appellee Keystone Ranch.

Gary L. Scritsmier and Frankie J. Dawson, of Kelley, Scritsmier, Moore & Byrne, P.C., for appellee NPPD.

HASTINGS, C.J., BOSLAUGH, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ., and COLWELL, D.J., Retired.

BOSLAUGH, J.

The plaintiff, Keystone Ranch Company, commenced this action in the winter of 1978 for damage to its land, pursuant to article I, § 21, of the Nebraska Constitution. The defendants are the Central Nebraska Public Power and Irrigation District (hereinafter Central District) and Nebraska Public Power District (hereinafter NPPD).

The plaintiff is the owner of 251 acres of accretion land located along the south bank of the North Platte River, in Keith County, Nebraska, approximately 4 miles east of Kingsley Dam in Keith County.

In 1937, the Central District constructed and presently operates Kingsley Dam and Lake C.W. McConaughy, and also operates Lake Ogallala, a small reservoir located immediately below Kingsley Dam. Lake McConaughy has approximately 2 million acre-feet of storage capacity. Its primary purpose is to store water for irrigation and hydroelectric power purposes.

The third amended petition, filed in 1982, alleged that the plaintiff had been damaged in the amount of $241,900 by the operation of Kingsley Dam by the Central District. The plaintiff contended that Kingsley Dam impeded the flow of the North Platte River and altered the silt-carrying capacity of the water as it was released from Kingsley Dam and Lake McConaughy reservoir, which was created by construction of the dam. The plaintiff further alleged that in 1971 and 1973, the Central District released excessive quantities of water from Kingsley Dam; that the excessive release of these waters degraded the North Platte River channel and caused the deepening of the riverbed adjacent to the accretion land by 8 to 10 feet; that the deepening of the North Platte River bed caused an 8- to 10-foot lowering of the adjacent water table under plaintiff's 251 acres of accretion land; that the lowering of the water table under plaintiff's accretion land deprived the trees and vegetation thereon of access to moisture and caused the trees and vegetation on the plaintiff's 251 acres of accretion land to die; and that by reason of the deepening of the riverbed,

the lowering of the water table, and the death of the trees and vegetation, the value of the plaintiff's 251 acres of accretion land was diminished.

## I. THE MOTIONS FOR SUMMARY JUDGMENT

Both defendants filed motions for summary judgment. On March 1, 1983, the district court sustained the Central District's motion for summary judgment. Thereafter, the plaintiff filed a motion for new trial, which was sustained by the district court on June 28, 1983, and the summary judgment in favor of the Central District was vacated. The Central District attempted to appeal the June 28, 1983, order of the district court, but this court dismissed that appeal on September 14, 1983. See *Keystone Ranch Co. v. Nebraska Public Power & Irrigation District*, 215 Neb. xxvi (case No. 83-568, Sept. 14, 1983). See, also, *Otteman v. Interstate Fire & Cas. Co., Inc.*, 171 Neb. 148, 105 N.W.2d 583 (1960).

The motion for summary judgment filed by NPPD on November 1, 1984, was overruled on December 1, 1985. At the pretrial conference held on November 30, 1987, the trial court announced that, on its own motion, it was "reconsidering the Motion for Summary Judgment filed by the defendant, Nebraska Public Power District," which matter was taken under advisement. On December 7, 1987, the trial court reversed its previous ruling, sustained the motion of NPPD, and dismissed the action as to NPPD.

The Central District has assigned as its first assignment of error the ruling of the trial court on the plaintiff's motion for new trial, and the plaintiff has cross-appealed from the order sustaining the motion for summary judgment filed by NPPD.

The plaintiff argues that the trial court could not reverse its ruling on the motion filed by NPPD because the term of court had expired. An order overruling a motion for summary judgment is an interlocutory order, not a final order from which an appeal can be taken, so the contention that the trial court could not reconsider the motion of NPPD because the term had expired is without merit. See, *Commerce Sav. Scottsbluff v. F.H. Schafer Elev.*, 231 Neb. 288, 436 N.W.2d 151 (1989); *Krueger v. Zarley*, 229 Neb. 203, 425 N.W.2d 893

(1988); *Schmuecker Bros. Implement v. Sobotka*, 217 Neb. 114, 348 N.W.2d 130 (1984); *Bryant Heating v. United States Nat. Bank*, 216 Neb. 107, 342 N.W.2d 191 (1983); *Cockle v. Cockle*, 215 Neb. 329, 339 N.W.2d 63 (1983); *Pressey v. State*, 173 Neb. 652, 114 N.W.2d 518 (1962); *Otteman v. Interstate Fire & Cas. Co., Inc., supra*; *Rehn v. Bingaman*, 157 Neb. 467, 59 N.W.2d 614 (1953).

The plaintiff argues that it was error for the trial court to reconsider the previous ruling on NPPD's motion. In *Bringewatt v. Mueller*, 201 Neb. 736, 272 N.W.2d 37 (1978), we held that a trial court, in its discretion, may permit the renewal and resubmission of a motion for summary judgment which has previously been overruled. In the *Bringewatt* case we said at 738, 272 N.W.2d at 38-39:

> Plaintiff contends that it was error for the court to allow the renewal of motions without an additional showing of facts. The previous order overruling the motions was not a final order and was not appealable. Pressey v. State of Nebraska, 173 Neb. 652, 114 N.W.2d 518. The order was interlocutory and none of the issues considered and decided by the court at the hearing became res judicata. The trial court has discretion to determine whether and under what circumstances a motion may be renewed. No abuse of that discretion has been shown. The procedure followed by the court was proper and the assignment of error is overruled.

In this case the parties have failed to preserve and present a record which will permit a review of the order overruling the motion of the Central District or the order sustaining the motion of NPPD. Since there is no bill of exceptions concerning the evidence which may have been offered at the hearing on the motion for summary judgment or at the hearing on the motion for new trial, there is nothing to review, and this court cannot determine whether error occurred. Affidavits, depositions, and other evidence considered at a hearing on a motion for summary judgment must be preserved in a bill of exceptions filed in the court before an order on such a motion may be reviewed. *Peterson v. George*, 168 Neb. 571, 96 N.W.2d 627 (1959); *Brown v. Shamberg*, 190 Neb. 171, 206 N.W.2d 846

(1973).

In the absence of a record of the evidence considered by the court, it is presumed that the order of the trial court was supported by the evidence and was correct. *Peterson v. George, supra.* Consequently, the assignments of error relating to the motions for summary judgment are without merit.

After various delays, continuances, and motions by other parties, the case was finally tried to a jury against only the Central District on December 14 to 17, 1987. The jury returned a verdict of $12,550 for the plaintiff. Judgment was entered on the verdict, and the plaintiff was awarded interest on the judgment from June 1, 1975, the date the damage allegedly occurred. Motions for new trial were filed by the Central District and by the plaintiff and overruled by the district court on April 12, 1988.

## II. SUFFICIENCY OF THE EVIDENCE

The Central District's second assignment of error alleges that the evidence was insufficient to support a finding that the operation of Kingsley Dam by the Central District caused the damage to the trees and vegetation on plaintiff's 251 acres of accretion land.

The Central District contends that it is not liable for the damage the plaintiff claims because the large quantities of water released from Lake McConaughy and Kingsley Dam in 1971 and 1973 were waters that would have flowed past the plaintiff's land in any event because of the large snowmelt and precipitation which occurred above Lake McConaughy during those years.

Frank Dragoun, the general manager of the Central District, testified that Kingsley Dam was built primarily to store water for irrigation purposes and not for flood control. According to Dragoun, the only reservoir on the North Platte River designed for flood control is the Glendo Reservoir in Wyoming. He noted that during certain periods Glendo Reservoir is operated by the Army Corps of Engineers but that generally it is operated by the Bureau of Reclamation. The significance of this fact is that the waterflow into Lake McConaughy is controlled by federal agencies. Therefore, the flow of water in the North

Platte River past the plaintiff's accretion land is controlled in part by the federal agencies operating Glendo Reservoir. In essence, the operators of Lake McConaughy must handle the waters as they are released from the upstream reservoirs.

The basis of the plaintiff's claim is that because of the dam, the water passing the plaintiff's land was "clean" water which picked up large amounts of silt and sand and caused the degradation of the bed of the river.

In reviewing a judgment in a civil case, this court considers the evidence most favorably to the successful party and resolves evidential conflicts in favor of such party, which is entitled to every reasonable inference deducible from the evidence. *Capps v. Manhart*, 236 Neb. 16, 458 N.W.2d 742 (1990); *Crewdson v. Burlington Northern RR. Co.*, 234 Neb. 631, 452 N.W.2d 270 (1990).

Taking the view of the evidence most favorable to the plaintiff, we find that the record shows that prior to the damage allegedly caused by the defendant Central District, the accretion land provided an ideal place to winter cattle. Eugene Feltz, the president of Keystone Ranch Company, testified, along with several of his neighbors, that the abundance of grass, trees, and undergrowth on the accretion land provided the cattle with feed and protection from the winter conditions. In its petition, the plaintiff contends that the defendants' actions caused the death of the trees and vegetation on the accretion land and that, as a result, the value of the land was diminished in value by $900 per acre.

Edward Soucek, a civil engineer who specializes in hydraulic structures, testified in support of the plaintiff's theory that the operation of Kingsley Dam by the Central District caused the damage to the plaintiff's accretion land. He testified that the release of large volumes of water in 1971 and 1973 from Kingsley Dam and Lake McConaughy caused the deepening of the riverbed and that the deepening of the riverbed in turn caused the lowering of the water table under the plaintiff's accretion land.

Soucek testified that to a considerable extent, Kingsley Dam controls the volume of water flowing in the natural channel of the North Platte River as it courses along the area of the

plaintiff's 251 acres of accretion land. Photographs made in 1939 and in 1965 which were received in evidence show the progressive constriction of the river's channel. From these photographs, Soucek testified that in 1939 the North Platte River opposite the Keystone Ranch property was flowing as a braided channel, that is, there were a large number of small channels which joined and separated and rejoined. By 1965, however, the river was confined to a single channel about 100 feet wide. According to Soucek, the progressive constriction of the river to a single channel was in part due to the presence of Kingsley Dam.

Soucek also testified that Kingsley Dam altered the silt-carrying capacity of the North Platte River. The North Platte River is a sediment-carrying river, in that its waters carry a substantial amount of sand as the waters move within the river's banks. However, like all such rivers, when its waters are impounded behind a dam, the North Platte River loses the capacity to transport sediment due to the reduced current. As a result, the water released from Kingsley Dam is clear water; that is, it contains no sediment.

Soucek testified that when clear water is released into the river it has a natural tendency to pick up sediment from the riverbed. Soucek testified further that when water picks up sediment from the riverbed, the bed is lowered by a process called degradation. According to Soucek, the process of degradation is directly influenced by the volume and velocity at which water is flowing. In other words, when the volume and velocity of the water increase, so too does the rate at which degradation of the riverbed occurs, causing the lowering of the riverbed. Soucek testified that the bed of the North Platte River has been lowered approximately 10 feet since the construction of Kingsley Dam.

According to Soucek, the 10-foot lowering of the North Platte River bed was substantially caused by the large increase in water releases from Kingsley Dam during 1971 and 1973. He stated that the increase in the amount, and duration of the increase, of released water in 1971 and 1973 caused an increase in the process of degradation. The increased degradation, according to Soucek, caused an increase in the lowering of the

riverbed. Soucek concluded by stating that the lowering of the North Platte River bed substantially caused the lowering of the water table under the plaintiff's accretion land.

Soucek made an investigative trip to the Keystone Ranch properties along the North Platte River to see firsthand what effect Kingsley Dam had had on the plaintiff's accretion land. Through a series of profiles—graphs showing the elevation of the surface of the ground at various points along a line—Soucek determined that the river level on August 7, 1984, was approximately 10 feet lower than the area in which the braided channel flowed in 1939. Soucek also made observations as to the location of the bed of the river in 1984 compared to what it would have been in 1939. He estimated that the difference in height between the level of the bed in 1984 and that in 1939 was approximately 10 feet.

Soucek introduced hydrographic charts to show that in 1971 and 1973, large amounts of water were released from Kingsley Dam. Exhibit 146 shows that between May 11 and June 30, 1971, the daily discharge of water reached over 7,000 cubic feet per second (cfs) for 18 days. Exhibit 147 shows that between May 6 and June 25, 1973, the daily discharge of water reached over 6,000 cfs for 18 days. Prior to 1971 and 1973 and subsequent thereto, the peak discharge of water rarely reached 4,000 cfs. According to Soucek, these figures are instructive as to the erosive power of the river, i.e., the ability of the river to cause degradation.

In sum, Soucek testified that the dramatic increase in water released from Kingsley Dam during 1971 and 1973 increased the degradation process in the river. The increased degradation caused a lowering of the riverbed, and the lowering of the riverbed caused the lowering of the water table under the plaintiff's accretion land.

Soucek testified that based upon his experience as an engineer, his field examination of Keystone Ranch, and his examination of aerial photos, hydraulic records, and the bed of the North Platte River adjacent to the Keystone Ranch properties, he believed that the water table under the plaintiff's accretion land was lowered as a result of the process of degradation which occurred in 1971 and 1973.

Philip Marvin, a plant pathologist who testified on behalf of the plaintiff, stated that the lowering of the water table under the plaintiff's accretion land caused the trees thereon to die. During his inspection of the Keystone Ranch properties, Marvin observed that the root system of the dead trees was very shallow. He noted that there was once a sufficient amount of moisture near the surface of the ground, which eliminated the necessity for a deep root system. Consequently, when the water table beneath the accretion land was lowered, the trees were left without a water supply, and they subsequently died.

James Harris, a real estate appraiser, provided testimony as to how the death of the trees, grass, and other vegetation affected the market value of the plaintiff's accretion land. Harris stated that there was an $87,000 diminution in the value of the accretion land as a result of the loss of trees, grass, and other vegetation.

As we view the record, the plaintiff's evidence presented questions for the jury as to whether the plaintiff's land had been damaged, whether the defendant Central District had caused the damage, and the amount of the damages.

### III. THE ADEQUACY OF THE VERDICT

The jury returned a verdict in favor of the plaintiff in the amount of $12,550. By cross-appeal, the plaintiff contends that the amount of the recovery was too small and that the verdict was contrary to the evidence.

Although the plaintiff produced expert testimony that the damages were greater than the amount of the verdict, John Childers, a farm and ranch real estate appraiser who testified on behalf of the Central District, stated that the value of the plaintiff's accretion land was not affected by the presence or absence of trees on the property. Childers testified that although the presence or absence of trees on property may affect a ranching operation, the market value of the property is not impacted by the presence or absence of trees.

The jury was not required to accept the testimony of any of the expert witnesses, including the testimony of Soucek. Triers of fact are not required to take the opinions of experts as binding upon them. *Briggs v. Consolidated Freightways*, 234

Neb. 410, 451 N.W.2d 278 (1990).

Although Kingsley Dam was constructed in 1937, apparently it caused no damage to the plaintiff's property until the floods of 1971 and 1973. Presumably, the degradation process was continuous since the dam was constructed, although not necessarily at a uniform rate.

There was other evidence that suggested the change in ground water levels may have been due to other causes. Ralph Knepper, the Central District's hydraulic engineer, testified that two wells on the plaintiff's property showed that the ground water level had actually risen and that the ground water levels north of the river had shown a gradual decline, probably due to extensive drilling of irrigation wells.

Also, on cross-examination, Eugene Feltz testified that there has been no change in the use of the property since the trees died.

From our review of the record we conclude that the evidence supports the verdict and it was not contrary to the evidence.

## IV. PREJUDGMENT INTEREST

The trial court awarded the plaintiff interest on the verdict from June 1, 1975. The Central District's third assignment of error alleges that the plaintiff should not recover any prejudgment interest because there was a reasonable controversy as to both the right to recover and the amount of the recovery.

In *Smith v. Platte Valley Public Power and Irrigation District*, 151 Neb. 49, 36 N.W.2d 478 (1949), the plaintiff claimed that his land had been damaged by seepage from the defendant's canal. The issues before the court were causation and damages, as they are in the present case. The jury returned a verdict for the plaintiff in the amount of $9,000, and the trial court denied prejudgment interest on the verdict from the date of the damage. The plaintiff's cross-appeal raised the question of the date from which the interest should have been computed. This court held at 56, 36 N.W.2d at 482-83:

We said in Missouri, Kansas & Texas Trust Co. v. Clark, 60 Neb. 406, 83 N.W. 202: "Regardless of the character of the action, interest is recoverable in all cases for the use or

destruction of property when the amount which is due the plaintiff may be known or ascertained approximately by reference to market values." See, also, Parkins v. Missouri P. Ry. Co., 76 Neb. 242, 107 N.W. 260.

However, here not only the amount is unliquidated but the liability, if any, must first be ascertained. Under these circumstances we think the following statement from Wittenberg v. Mollyneaux, 59 Neb. 203, 80 N.W. 824, is applicable: "If the right to damages for breach of a contract is a matter of reasonable litigation, and the amount to be recovered, if any, is unliquidated and must be fixed, not by mere computation but by suit, interest may not be allowed for time precedent to the settlement of the right to a recovery and the ascertainment of the amount." See Gee v. City of Sutton, 149 Neb. 603, 31 N.W.2d 747.

In view of the substantial controversy in this case as to both the right to recover and the amount of the recovery, we conclude that the plaintiff should not recover prejudgment interest.

The judgment is affirmed in all respects except as to the recovery of prejudgment interest. The judgment is modified by deleting the allowance of prejudgment interest, and as so modified, the judgment is affirmed.

AFFIRMED AS MODIFIED.