MARY REAVIS, APPELLEE AND CROSS-APPELLANT, V. JAMES SLOMINSKI, D.D.S., APPELLANT AND CROSS-APPELLEE.
551 N.W.2d 528

Filed August 9, 1996. No. S-94-288.

Michael J. Mooney and Susan E. Norris, of Gross & Welch, P.C., for appellant.

Thom K. Cope, of Bailey, Polsky, Cope, Knapp & Nelson, for appellee.

WHITE, C.J., CAPORALE, FAHRNBRUCH, LANPHIER, WRIGHT, CONNOLLY, and GERRARD, JJ.

LANPHIER, J.

Alleging she was sexually assaulted, Mary Reavis filed a civil action against the alleged attacker, James Slominski, D.D.S. The petition stated two causes of action—one for the tort of sexual assault and one for the tort of intentional infliction of emotional distress. Slominski denied those allegations and further alleged that any contact with Reavis was consensual. Trial before a jury commenced in the district court for Richardson County on January 12, 1994. At the close of Reavis' case, Slominski's motion for a directed verdict was overruled. At the close of all the evidence, Slominski renewed his motion for a directed verdict, which was again overruled. The jury returned a verdict in favor of Reavis on the sexual assault cause of action and in favor of Slominski on the intentional infliction of emotional distress cause of action. Slominski timely appealed, and Reavis cross-appealed.

In his appeal, Slominski asserts that the district court erred in refusing to direct a verdict in his favor, in admitting certain

evidence, in instructing the jury as it did regarding consent, in refusing to instruct the jury regarding capacity to consent and economic duress, and in failing to set aside the verdicts as inconsistent. In her cross-appeal, Reavis asserts that the district court erroneously instructed the jury on the elements of the tort of intentional infliction of emotional distress. A majority of this court concurs that the district court properly refused to grant Slominski's motions for a directed verdict. A majority also concurs that the jury's verdict regarding the sexual assault claim must be reversed and that that matter be remanded for a new trial.

## I. BACKGROUND

Reavis was employed by Slominski as a receptionist in his dental clinic located in Falls City, Nebraska. Reavis alleges that Slominski sexually assaulted her on December 31, 1991, after a New Year's Eve office party.

Reavis first worked for Slominski at his dental clinic from 1969 to 1975 as a chair-side assistant, with one brief absence. Reavis testified that there were many occasions during the early 1970's when Slominski fondled her. Reavis stated that she felt that she could not say anything to him because she needed to work. When she did ask Slominski to stop touching her, he would laugh and say, " 'You know you like it.' "

Reavis married her husband, Frank, in February 1972. Reavis testified that Slominski continued to touch her. Although Slominski never told Reavis that he would fire her if she objected, Reavis stated that Slominski said she would lose her job and her marriage if she told anyone.

In or around 1973, Slominski and Reavis began to engage in sexual intercourse. Although Reavis said no, she claims she felt that she had no choice but to engage in relations. Reavis admitted that Slominski never physically forced her to have sex with him. Reavis testified that she could not quit her job because she needed the money to support her family. However, Reavis admitted that there were times when she was able to successfully refuse Slominski's advances.

In 1975, Reavis' husband obtained employment in Lincoln, and Reavis left Slominski's employment. The Reavises

returned to Falls City in 1978, and Reavis worked for another dentist.

In the summer of 1988, Reavis was unemployed and Slominski offered her a job. Reavis testified that she told Slominski that before she would accept the position, he had to promise to leave her alone. Reavis testified that Slominski did not try to engage in sexual intercourse with her from 1988 until December 31, 1991. However, Reavis stated that Slominski touched her several times during that time period. As before, Reavis said she did not quit because her family needed the money.

On December 31, 1991, the employees of the dental clinic had an office party. The party began about 1 p.m. Reavis and Slominski each admit that they became somewhat intoxicated. Reavis testified that after the party began to wind down around 5 p.m., she and another employee, Kathy Foster, cleaned up the clinic. Foster left, and Reavis and Slominski were alone in the clinic. Reavis testified that she was in the lab clocking out when she heard Slominski lock the back door.

Reavis said that Slominski came into the lab and began kissing her. Reavis testified that she pushed Slominski away and told him no. Slominski laughed and said, " 'You know you want it.' " Reavis said, " 'Oh, hell,' " and then walked down the hall toward Slominski's office and "threw [her] sweater off." Reavis testified that she felt there was nothing she could do because Slominski would just laugh at her. In the office, Reavis admonished Slominski and said, " 'You know you should not be doing this.' " Reavis felt that if she did not comply, she would lose her job. She said that she numbed her mind and body during the sexual intercourse, but that the physical contact was hurting her "very bad."

While Reavis and Slominski were engaged in sexual conduct, Foster came back into the dental clinic. Foster noticed an article of clothing in the hall and said, " 'I hope the two of you are having fun in there.' " Reavis asked Slominski if Foster had seen them, and Slominski said yes. Reavis and Slominski got dressed and left the dental clinic.

After Reavis left the dental clinic, she went home. A short time later, Reavis went to a restaurant where she held a sec-

ond job. Although she was not scheduled to work, Reavis met some of the people she worked with and had some champagne. Reavis did not tell any of her friends about the events of the afternoon and did not report the sexual contact to the police.

That evening, Reavis was unable to sleep. She woke her husband and told him that " 'Dr. Slominski had sex with me.' " Her husband was very upset. During the next several days, the couple sought counseling with their pastor, but Reavis remained quite distraught. During the night of January 3, Reavis attempted suicide by ingesting sleeping pills.

Reavis was hospitalized for several weeks in January and was still under medical care at the time of the trial. As a result of the alleged sexual assault, Reavis states that she has suffered damages due to her inability to work. Reavis alleges that she required hospitalization and counseling as a result of the emotional distress proximately caused by Slominski's wrongful conduct.

Reavis further alleges that Slominski acted intentionally and with reckless disregard of her emotional suffering by his conduct on New Year's Eve. Reavis asserts that Slominski's conduct was outrageous in character and so extreme in degree that it should be regarded as atrocious and intolerable in a civilized community. Reavis states that Slominski's conduct proximately caused her extreme emotional distress resulting in damages.

By his answer, Slominski denied Reavis' allegations. Slominski alleged that Reavis encouraged and promoted a private meeting after the New Year's Eve party and that Reavis initiated consensual sexual contact. Slominski testified that Reavis called him back into the office as he was leaving the party and initiated the sexual contact. When Reavis began to disrobe, Slominski assumed that she wanted sexual contact. Slominski stated that his relationship with Reavis during the early 1970's was an affair involving two consenting adults.

## II. ASSIGNMENTS OF ERROR

Slominski asserts that the district court erred in failing to grant his motions for a directed verdict, in receiving evidence that Reavis was abused as a child over relevance objections, in giving erroneous jury instructions, in receiving an exhibit

without proper foundation, and in failing to set aside the jury verdicts as inconsistent.

In her cross-appeal, Reavis asserts that the district court erred in failing to give her proposed jury instruction on sexual assault as being applicable to intentional infliction of emotional distress.

## III. ANALYSIS

### 1. OVERVIEW

In order to succeed on her theory of recovery regarding sexual assault, Reavis was required to prove that Slominski had sexual contact with her without her consent and that he acted with intent to inflict physical injury or contact upon her which resulted in physical injury proximately causing some damage. Reavis was also required to prove the nature and extent of her alleged damages.

Reavis' cause of action for sexual assault is technically a cause of action for battery.

> Battery and assault are separate torts resulting from a defendant's intentional actions directed toward another. . . . A battery requires "an actual infliction" of an unconsented injury upon or unconsented contact with another. . . . In contrast, we have characterized the intentional tort of assault as a " 'wrongful offer or attempt with force or threats, made in a menacing manner, with intent to inflict bodily injury upon another with present apparent ability to give effect to the attempt,' " without requiring that the one assaulted be subjected to any actual physical injury or contact.

(Citation omitted.) *Bergman v. Anderson*, 226 Neb. 333, 336, 411 N.W.2d 336, 339 (1987).

A review of the record indicates that Reavis' trial strategy contained two theories. Reavis attempted to prove that her actions did not constitute consent to sexual contact with Slominski on December 31. Alternatively, Reavis attempted to establish that if such actions did amount to consent, such consent was not effective because she lacked mental capacity and that any consent was coerced, in part, by her fear that she would lose her job.

By his answer and arguments, Slominski concedes that he did have sexual contact with Reavis. However, Slominski argues that the contact was between two consenting adults. Slominski asserts that Reavis failed to prove that she did not consent to the sexual contact on December 31 and that she gave apparent consent to the contact. Slominski states that he had no knowledge of Reavis' alleged incapacity and that therefore her consent was effective. Slominski concludes that the court erred by failing to direct a verdict in his favor.

Second, Slominski asserts that the trial court failed to correctly instruct the jury regarding capacity to consent and economic duress. Slominski tendered two jury instructions regarding capacity and duress which were directed to the effectiveness of consent.

In her cross-appeal, Reavis asserts that the district court erred in failing to give her requested instruction for intentional infliction of emotional distress.

## 2. DIRECTED VERDICT—ISSUE OF CONSENT

### (a) Standard of Review

When a motion for directed verdict made at the close of all the evidence is overruled by the trial court, appellate review is controlled by the rule that a directed verdict is proper only where reasonable minds cannot differ and can draw but one conclusion from the evidence, and the issues should be decided as a matter of law. *Hoeft v. Five Points Bank*, 248 Neb. 772, 539 N.W.2d 637 (1995); *Richardson v. Ames Avenue Corp.*, 247 Neb. 128, 525 N.W.2d 212 (1995); *Lindsay Mfg. Co. v. Universal Surety Co.*, 246 Neb. 495, 519 N.W.2d 530 (1994).

In all proceedings where the Nebraska Evidence Rules apply, admissibility of evidence is controlled by the Nebraska Evidence Rules, not by judicial discretion, except in those instances under the Nebraska Evidence Rules when judicial discretion is a factor involved in the admissibility of evidence. *Walpus v. Milwaukee Elec. Tool Corp.*, 248 Neb. 145, 532 N.W.2d 316 (1995); *McDonald v. Miller*, 246 Neb. 144, 518 N.W.2d 80 (1994); *McDermott v. Platte Cty. Ag. Socy.*, 245 Neb. 698, 515 N.W.2d 121 (1994). The admissibility of evi-

dence is reviewed for abuse of discretion where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court. *Walpus v. Milwaukee Elec. Tool Corp., supra*; *McDermott v. Platte Cty. Ag. Socy., supra.*

### (b) Actual or Apparent Consent

"In tort law, consent ordinarily bars recovery for intentional interferences with person or property." *Schieffer v. Catholic Archdiocese of Omaha*, 244 Neb. 715, 718, 508 N.W.2d 907, 911 (1993).

> Except in the case of persons whom the law protects for reasons of policy, such as those who are mentally immature or otherwise incompetent (see Comment *b*), no one suffers a legal wrong as the result of an act to which, unaffected by fraud, mistake or duress, he freely consents or to which he manifests apparent consent. (See § 892). This principle is expressed in the ancient legal maxim, *volenti non fit injuria*, meaning that no wrong is done to one who consents.

Restatement (Second) of Torts § 892 A, comment *a*. at 364 (1979).

Section 892 of the Restatement states:

> (1) Consent is willingness in fact for conduct to occur. It may be manifested by action or inaction and need not be communicated to the actor.
>
> (2) If words or conduct are reasonably understood by another to be intended as consent, they constitute apparent consent and are as effective as consent in fact.

One can consent to a personal invasion such as sexual contact even if such contact is immoral or harmful to one's own interests. " 'Consent avoids recovery simply because it destroys the wrongfulness of the conduct as between the consenting parties . . . .' " *Schieffer v. Catholic Archdiocese of Omaha*, 244 Neb. at 719, 508 N.W.2d at 911 (quoting W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 18 (5th ed. 1984)). If one says yes to sexual contact, no matter how distasteful or wrong, the contact cannot constitute a sexual battery because, by definition, battery involves contact without consent.

If Reavis did not consent on December 31, then Slominski was guilty of sexual assault.. If Reavis gave actual or apparent consent to the sexual contact, then, as a matter of law, Slominski may have been entitled to a directed verdict on that theory of recovery. However, as discussed in the following section, if Reavis suffered from some incompetency or abnormality on December 31 which rendered her actual or apparent consent ineffective, then Reavis may be within the category of "persons whom the law protects for reasons of policy, such as those who are mentally immature or otherwise incompetent."

A trial court should direct a verdict as a matter of law only when the facts are conceded, undisputed, or such that reasonable minds can draw but one conclusion therefrom. *Nickell v. Russell*, 247 Neb. 112, 525 N.W.2d 203 (1995); *Lindsay Mfg. Co. v. Universal Surety Co.*, 246 Neb. 495, 519 N.W.2d 530 (1994); *Kozeny v. Miller*, 243 Neb. 402, 499 N.W.2d 75 (1993).

The party against whom a verdict is directed is entitled to have every controverted fact resolved in his or her favor and to have the benefit of every inference which can reasonably be drawn from the evidence. If there is any evidence which will sustain a finding for the party against whom the motion is made, the case may not be decided as a matter of law. *Nickell v. Russell, supra; Lindsay Mfg. Co. v. Universal Surety Co., supra*.

Giving Reavis the benefit of all of the inferences which can reasonably be drawn from the evidence, there is some evidence which will sustain a finding that Reavis did not give actual consent or apparent consent to the sexual contact. Reavis initially said no, and her subsequent conduct can be considered ambiguous. The fact that Reavis began disrobing does not necessarily indicate that she consented to the sexual contact if the prior events indicated that she felt that she had no other choice but submission at that time. Reavis' comment to the effect of "what the hell" could be read either as a surrender or as consent, grudgingly or otherwise. The testimony was in conflict.

### (c) Effective Consent

Assuming arguendo that Reavis did consent to the sexual contact, the next question is whether the consent was effective. Reavis introduced evidence in an effort to establish that if she did consent to sexual contact on December 31, such consent was not effective. Much of that evidence focused on the effect of certain childhood abuse on Reavis' ability to refuse unwanted sexual contact as an adult.

Slominski asserts that

[t]he admission of evidence of plaintiff's abuse as a child constituted prejudicial error . . . because it allowed the jury to speculate that the plaintiff Mary Reavis did not have the capacity to consent. Since there was no evidence that Slominski had any knowledge of her supposed incapacity, such evidence was completely irrelevant . . . .

Brief for appellant at 20. Slominski concludes that as a matter of law, if he had no knowledge of Reavis' supposed incapacity, her apparent consent to the sexual contact was effective consent and that therefore, the district court erred by failing to grant a verdict in his favor.

"To avoid liability, consent must be effective." W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 18 at 114 (5th ed. 1984). Consent is ineffective if the person lacks capacity to consent to the conduct. *Id.*; Restatement (Second) of Torts § 892 A(2)(a) (1979). "Generally . . . one who has reached the age of majority can give an effective consent to all kinds of conduct unless the defendant knows or has reason to know of some kind of abnormality, temporary or permanent, of the consenting person." Keeton et al., *supra*, § 18 at 114. Note that there are two aspects to the effectiveness of consent: abnormality on the part of the alleged victim and knowledge on the part of the alleged attacker.

In Nebraska, any person who subjects another person to sexual intercourse or sexual contact who knew or should have known that the victim was physically or mentally incapable of resisting or appraising the nature of his or her conduct is guilty of sexual assault. Neb. Rev. Stat. §§ 28-319(1) and 28-320(1) (Reissue 1989). The lack of the victim's consent is not an element of the crime of sexual assault when the victim

is incapable of resisting or of appraising the nature of his or her conduct. *Id.*; *In re Interest of J.M.*, 223 Neb. 609, 391 N.W.2d 146 (1986).

In criminal law, the issue of the extent and degree of abnormality required to render a victim's consent ineffective has been hotly debated. See, e.g., Annot., Rape or Similar Offense Based on Intercourse With Woman Who Is Allegedly Mentally Deficient, 31 A.L.R.3d 1227 (1970); *State v. Olivio*, 123 N.J. 550, 589 A.2d 597 (1991); *State v. Sullivan*, 298 N.W.2d 267 (Iowa 1980). Some jurisdictions follow an expansive interpretation and hold that unless one understands both the physical elements of sex and the moral quality of the conduct, then one is not capable of giving effective consent to sexual contact. *State v. Olivio, supra.* Other jurisdictions are less protective of the mentally disturbed or handicapped and construe the effectiveness of consent based upon an understanding of its physiology alone. It would appear that issue of effective consent to sexual contact is generally only raised when the victim suffers from an extreme mental handicap or deficiency.

However, Nebraska criminal law also recognizes that an otherwise competent person can be sexually assaulted if the person is physically or mentally incapable of resisting. See §§ 28-319 and 28-320.

Nebraska criminal law is consistent with the legal test for effective consent which examines whether an adult cannot give effective consent because the person suffers from a temporary or permanent abnormality. Sections 28-319 and 28-320 provide that the abnormality may be an inability to resist or the lack of understanding of the nature of sexual relations. This analysis is equally applicable in tort law.

Reavis does not assert that she suffered from an abnormality rendering her incapable of understanding the physical or moral elements of sexual relations. Rather, Reavis asserts that she suffered from an abnormality rendering her incapable of resisting unwanted sexual relations on December 31.

Although it is questionable whether Reavis' allegations of her incapacity are sufficient to place Reavis within the category of mentally incompetent persons whom the law protects

for reasons of policy, Slominski did not raise this issue at trial or in this appeal. Slominski objects to the admissibility of evidence regarding Reavis' alleged incapacity to consent for the sole reason that she failed to prove that he had any knowledge of such incapacity.

Slominski's narrowly phrased argument is addressed as it was posited in this appeal and as it was argued at trial. Generally, an appellate court will dispose of a case on the theories which were presented to the trial court. *Sunrise Country Manor v. Neb. Dept. of Soc. Servs.*, 246 Neb. 726, 523 N.W.2d 499 (1994); *Long v. Hacker*, 246 Neb. 547, 520 N.W.2d 195 (1994). Restated, Slominski argues that Reavis had to prove that Slominski knew she lacked the capacity to consent in order for the evidence regarding her childhood abuse to be relevant and admissible.

Reavis testified to her childhood fear of her father's discipline and several instances of sexual abuse by relatives. Reavis also testified that she was afraid to say no to Slominski because she needed the job. Allegedly, both of these factors undermined Reavis' ability to refuse unwanted sexual contact with Slominski.

Dr. Wesley Sime, a clinical psychologist, was hired as an expert witness to testify on Reavis' behalf. Dr. Sime testified that an adult who was abused as a child may fear protesting too vigorously. In Dr. Sime's opinion, Reavis' ability to withhold consent on December 31 was compromised by the circumstances of her isolation and the locked door. In that situation, Reavis would have difficulty saying no and enforcing her refusal.

Dr. Y. Scott Moore, Reavis' treating psychiatrist, testified that Reavis'

> history of early sexual harassment places her in the category of victim to start with. Following that, she turns into a person, as is usual with more (sic) sexually abused young girls, who has pretty low self-esteem, who has difficulty seeing any worth, who is quite dependent, has difficulty saying no and meaning it, and has a tendency to view assaults as her due because she is damaged goods to begin with.

Therefore, there was some evidence that Reavis may have lacked the capacity to give effective consent on December 31, creating a question for the jury. "Triers of fact are not required to take opinions of experts as binding upon them." *Vredeveld v. Clark*, 244 Neb. 46, 51, 504 N.W.2d 292, 296 (1993). Accord *Keystone Ranch Co. v. Central Neb. Pub. Power & Irr. Dist.*, 237 Neb. 188, 465 N.W.2d 472 (1991). Determining the weight that should be given expert testimony is uniquely the province of the fact finder, and where there is evidence from an expert, a directed verdict should not be granted. *Vredeveld v. Clark, supra*; *In re Application A-16642*, 236 Neb. 671, 463 N.W.2d 591 (1990).

Slominski testified that he had no knowledge of Reavis' childhood abuse and that, therefore, he had no hint that Reavis was emotionally disturbed in any manner. Slominski claims that, therefore, the evidence regarding her alleged incapacity was inadmissible. However, the issue is whether Slominski knew, *or had reason to know*, that Reavis had an abnormal inability to refuse unwanted sexual contact. Lack of knowledge of the *cause* of such abnormal inability does not negate knowledge of the abnormality itself. If Slominski knew that he could engage in sexual contact with Reavis against her will, then Reavis could not have given effective consent. Such knowledge could be based on the fact that he had repeatedly been able to engage in sexual contact in the past despite her requests that he not touch her.

It is true that relevancy of Reavis' evidence regarding her incapacity hinged on proof that Slominski knew or had reason to know of the incapacity. However, as in many cases,

> only one fact can be proven at a time or by a given witness . . . .
>
> . . . [T]he everyday method of handling the situation when the adversary objects to the relevancy or the competency of the offered fact is to permit it to come in conditionally, upon the assurance, express or implied, of the offering counsel that she will "connect up" the tendered evidence by proving, in the later progress of his case, the missing facts. Federal and Revised Uniform Rules of

Evidence 104(b) and 611(a) give the court this same authority.

1 McCormick on Evidence § 58 at 233 (John W. Strong 4th ed. 1992).

"When the relevancy of evidence depends upon the fulfillment of a condition of fact, the judge shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition." Neb. Rev. Stat. § 27-104(2) (Reissue 1995). The burden is on the objecting party to object if the offering counsel fails to connect up, and this is generally done with a motion to strike. 1 McCormick on Evidence, *supra*.

The district court did not abuse its discretion by overruling Slominski's relevance objections at the time the testimony was adduced. Upon request, the court should have admitted the testimony conditionally and should have granted a motion to strike if the court concluded that Reavis failed to prove Slominski knew or should have known of her alleged incapacity. Slominski pursued neither of these options. Failure to make a timely objection waives the right to assert prejudicial error on appeal. *Barks v. Cosgriff Co.*, 247 Neb. 660, 529 N.W.2d 749 (1995); *Nichols v. Busse*, 243 Neb. 811, 503 N.W.2d 173 (1993).

### (d) Resolution

Giving Reavis the benefit of every controverted fact and every inference which can reasonably be drawn from the evidence, there is some evidence which will sustain a finding for her and the court properly refused to direct a verdict in favor of Slominski.

### 3. Jury Instructions

Slominski asserts that the district court erred in instructing the jury on consent and refusing to give his proposed instructions with regard to capacity and duress.

### (a) Standard of Review

Jury instructions are generally subject to the harmless error rule, and an erroneous jury instruction requires reversal only if the error adversely affects substantial rights of the com-

plaining party. *Bunnell v. Burlington Northern RR. Co.*, 247 Neb. 743, 530 N.W.2d 230 (1995); *Plambeck v. Union Pacific RR. Co.*, 232 Neb. 590, 441 N.W.2d 614 (1989).

(b) Analysis

To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *Klawitter v. Lampert*, 248 Neb. 231, 533 N.W.2d 896 (1995); *Sindelar v. Canada Transport, Inc.*, 246 Neb. 559, 520 N.W.2d 203 (1994); *Burns v. Metz*, 245 Neb. 428, 513 N.W.2d 505 (1994).

The district court gave the following instructions, in pertinent part:

### INSTRUCTION NO. 2
### I. PLAINTIFF CLAIMS
### A. ISSUES

This case involves an incident which occurred December 31, 1991. It is alleged by plaintiff that the defendant on this date had sexual contact with plaintiff without her consent and as a result of this contact, plaintiff seeks damages in two causes of action.

### B. FIRST CAUSE OF ACTION
### ASSAULT - BURDEN OF PROOF

In order to prove the claim of sexual assault, the plaintiff must establish by the greater weight of the evidence all of the following propositions:

1. The defendant sexually assaulted the plaintiff on December 31, 1991, without her consent.

2. The defendant acted with the intent to inflict physical injury or contact upon her.

3. The defendant's act resulted in physical injury.

4. The defendant's act was the proximate cause of some damage.

5. The nature and extent of that damage.

## C. EFFECT OF FINDINGS

If the plaintiff has not met this burden of proof, then you must find for the defendant on this cause of action.

If the plaintiff has met this burden of proof, then you must find for the plaintiff on this cause of action.

The district court's instruction No. 11 stated:

Consent is willingness in fact or conduct to occur. It may be manifested by action or inaction and need not be communicated to the actor.

If words or conduct are reasonably understood by another to be intended as consent, they constitute apparent consent and are as effective as consent in fact.

A manifestation of consent, upon which the defendant may reasonably rely, will be equally effective even though there is no willingness in fact. The defendant is entitled to rely upon what any reasonable person would understand from the plaintiff's conduct.

Slominski's proposed instruction regarding consent was substantially similar to the given instruction. However, the last sentence of Slominski's proposed instruction stated, "Silence and inaction may manifest consent where a reasonable person would speak if he or she objected." It is not error to refuse to give a requested instruction if the substance of the request is in the instructions actually given. *Scharmann v. Dayton Hudson Corp.*, 247 Neb. 304, 526 N.W.2d 436 (1995); *Nichols v. Busse*, 243 Neb. 811, 503 N.W.2d 173 (1993). Slominski was not prejudiced by the court's failure to include this last sentence in the instruction it gave to the jury.

Slominski's instruction regarding the meaning of consent also contained this example: "A, a young man, is alone with B, a girl, in the moonlight. A proposes to kiss B. Although inwardly objecting, B says nothing and neither resists nor protests by any word or gesture. A kisses B. A is not liable to B."

The district court properly refused to give the hypothetical example to the jury. "The proper method of presenting a case to a jury in its instructions is by a clear and concise statement by the trial court of the issues which find support in the evidence." *Wilson v. Misko*, 244 Neb. 526, 541, 508 N.W.2d

238, 249 (1993). The hypothetical example would not instruct the jury on the law, but instead would apply the law to a strikingly similar fact pattern.

What is more problematic is the district court's refusal to give Slominski's proposed instructions regarding the issue of effective consent. The jury was instructed regarding apparent consent only, but Reavis presented a substantial amount of evidence in an attempt to convince the jury that if it concluded that she had given apparent consent to Slominski, then such consent was not effective. Reavis attempted to prove that her consent was not effective due to her lack of capacity and because any consent arose out of her fear that she would lose her job. Having admitted the evidence regarding effective consent, the court's refusal to properly instruct the jury constitutes reversible error.

The district court rejected Slominski's proposed instruction No. 3, which stated:

> One who has reached the age of majority can give an effective consent to all kinds of conduct unless the defendant knows of some kind of abnormality, temporary or permanent, on the part of the consenting person. The abnormality must substantially impair the plaintiff's capacity to understand and weigh the harm and risks of harm against the benefits flowing from the proposed conduct, and the abnormality must reduce her capacity to consent below the level of the average person. The defendant must have knowledge of the abnormality at the time of the alleged act.

Jury instruction No. 3 reflects the position of the Restatement (Second) of Torts § 892 A(2)(a) and comment *b*. (1979), and the views found in W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 18 (5th ed. 1984).

Slominski also tendered instruction No. 4, which stated, "A threat of economic duress such as the threat of a future loss of employment is not sufficient to invalidate the consent given." The district court also refused to give this instruction.

"Consent is not effective if it is given under duress." The Restatement, *supra*, § 892 B(3) at 370. See, also, Keeton et al., *supra*, § 18.

> Duress is constraint of another's will by which he is compelled to give consent when he is not in reality willing to do so. Persuasion amounting to a form of constraint can take various forms and many of them, commonly encountered in daily life, are without legal effect and are not normally characterized as duress. . . .
>
> . . . The cases to date in which duress has been found to render the consent ineffective have involved those forms of duress that are quite drastic in their nature and that clearly and immediately amount to an overpowering of the will.

The Restatement, *supra*, § 892 B, comment *j*. at 375.

Reavis repeatedly testified that she was reluctant to refuse Slominski's advances because she needed to work. Although Slominski never explicitly threatened to fire Reavis if she did not submit, Reavis feared that she would lose her job. Reavis also offered expert testimony attempting to establish that she lacked capacity to consent to sexual relations with Slominski.

Where an instruction is properly requested upon some special feature of the case presented by the pleading and the evidence, it should be given, unless covered by other instructions. *Pospisil v. Acton*, 118 Neb. 200, 224 N.W. 11 (1929). Slominski was entitled to have the jury instructed regarding how to evaluate Reavis' alleged incapacity and her fear of job loss as to the effectiveness of her consent.

Given the theories of this case, the jury would have benefited from being instructed to reach its decision using a step-by-step analysis. First, the jury should have been instructed to consider whether Reavis refused Slominski's sexual advances on December 31. If the jury concluded that Reavis gave real or apparent consent to the contact, then the jury should have been instructed to consider whether Reavis' consent was effective.

### (c) Resolution

Slominski's tendered instructions correctly stated the law applicable to this case and were warranted by the evidence. The district court's refusal to give Slominski's proposed jury instructions regarding capacity and duress constitutes prejudi-

cial error requiring remand to that court for a new trial on the sexual assault claim.

Because we reverse for this reason, it is not necessary to reach Slominski's remaining assignments of error.

## 4. CROSS-APPEAL

In her cross-appeal, Reavis asserts that the district court erred in failing to give her proposed instruction on sexual assault as being applicable to intentional infliction of emotional distress claims.

Reavis' proposed jury instruction stated: "Should you find from a preponderance of the evidence presented that the actions of the Defendant on December 31, 1991, constituted a non-consensual sexual assault, you may find that the assault constitutes an intentional infliction of emotional distress . . . ."

Reavis' argument is based, in part, upon *Mindt v. Shavers*, 214 Neb. 786, 337 N.W.2d 97 (1983). In *Mindt v. Shavers*, we stated that the very nature of the tort of sexual assault is uniquely appropriate for a suit based upon a theory of intentional infliction of emotional distress.

The burden of proof upon the plaintiff in a cause of action for intentional infliction of emotional distress is to prove:

> " '(1) [t]hat there has been intentional or reckless conduct; (2) [t]hat the conduct was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and is to be regarded as atrocious and utterly intolerable in a civilized community; and (3) [t]hat the conduct caused emotional distress so severe that no reasonable person should be expected to endure it.' "

*Schieffer v. Catholic Archdiocese of Omaha*, 244 Neb. 715, 718, 508 N.W.2d 907, 910 (1993) (quoting *Nichols v. Busse*, 243 Neb. 811, 503 N.W.2d 173 (1993)).

Reavis' tendered jury instruction is not a correct statement of the law. In order to find that Slominski had acted intentionally to inflict emotional distress upon Reavis, the jury would have had to make two additional findings beyond concluding that a sexual assault had taken place. The jury would

also have had to conclude that Slominski's conduct was outrageous and that such conduct caused severe emotional distress. Therefore, Reavis' assignment of error is without merit.

## IV. CONCLUSION

In summary, in this appeal, Slominski asserts that the district court erred in failing to grant his motions for a directed verdict because Reavis consented to the sexual contact. However, there was some evidence which could sustain a finding that Reavis did not give actual or apparent consent to the sexual contact. The district court properly refused to direct a verdict.

Second, there is the issue of effective consent. If Reavis did consent to the sexual contact with Slominski, the question is whether Reavis suffered from some abnormality which rendered her consent ineffective. The district court properly admitted evidence attempting to prove that Reavis could not give effective consent because she lacked the capacity to resist unwanted sexual relations on December 31. Having admitted such evidence, the district court erred by failing to instruct the jury regarding how incapacity and duress may or may not deprive Reavis' alleged consent of its effectiveness. Accordingly, the jury's verdict regarding the sexual assault claim is reversed, and that matter is remanded for a new trial.

One of the accompanying dissents recasts the posture of this case at trial and on appeal. As stated above, it is our oft-repeated rule that an appellate court will not consider an issue on appeal that was not presented to or passed upon by the trial court. *Kropf v. Kropf*, 248 Neb. 614, 538 N.W.2d 496 (1995); *Ashland State Bank v. Elkhorn Racquetball, Inc.*, 246 Neb. 411, 520 N.W.2d 189 (1994); *How v. Mars*, 245 Neb. 420, 513 N.W.2d 511 (1994). We will dispose of a case on theories which were presented to the trial court. *Sunrise Country Manor v. Neb. Dept. of Soc. Servs.*, 246 Neb. 726, 523 N.W.2d 499 (1994); *Long v. Hacker*, 246 Neb. 547, 520 N.W.2d 195 (1994). Moreover, appellate review is limited to those errors specifically assigned in the appeal to the district court and again assigned as error in an appeal to a higher

appellate court. *In re Estate of Soule*, 248 Neb. 878, 540 N.W.2d 118 (1995).

The theory posited by the dissent in question to exclude the expert testimony regarding Reavis' alleged incapacity rests upon the assertion that the legal test for capacity to consent to sexual intercourse is whether one understands and appreciates the nature of the act of sexual intercourse, its character, and the probable or natural consequences which may attend it. That dissent states that since Reavis is a woman possessing "substantial sexual experience" and has borne four children, she understands and appreciates the nature of sexual intercourse. Therefore, the dissent concludes that the expert opinion testimony stating that childhood abuse rendered Reavis incapable of resisting unwanted sexual contact was inadmissible because such testimony does not relate to the legal test for capacity.

That theory is narrower than the general rule stated in this opinion. The legal test for incapacity encompasses more than an inability to understand the nature of sexual relations and their consequences. The legal test is that one can give effective consent to all kinds of conduct unless the defendant knows or has reason to know of *some kind of abnormality*, temporary or permanent, of the consenting person. There are two types of abnormalities that render a victim's consent to sexual relations ineffective. If the victim cannot resist *or* is incapable of understanding the nature of the conduct, the victim's consent is ineffective.

Reavis consistently argued that she was unable to refuse Slominski's advances. Although the dissent focuses on abnormalities rendering victims incapable of understanding sexual relations, Reavis never argued that she was included within that class of victims. Neither did Slominski argue that at trial or on appeal.

Therefore, the dissent not only recasts the theories presented to the trial court but supplements the legal arguments made to this court in Slominski's briefs. This is contrary to our normal procedure against reviewing errors which were not assigned and argued in the brief.

The dissent would narrow the type of abnormality contemplated by the law of consent to abnormalities leading to a lack of understanding of sexual relations or their consequences. For example, a victim rendered unable to resist due to drugs, alcohol, or ill health might not have any recourse in civil law under the dissent's view if the defendant were able to prove that the victim "consented" under that narrow definition.

The dissent appears to urge that a sexual assault of a "substantially sexually experienced woman" requires the use of physical force. Although this is made in support of the dissent's limited view of effective consent, the reasoning harkens back to a time when "unchaste women" and "errant young girls" had difficulty pressing sexual assault complaints absent strong evidence of the use of force. See, *Frank v. State*, 150 Neb. 745, 35 N.W.2d 816 (1949); *Redmon v. State*, 150 Neb. 62, 33 N.W.2d 349 (1948). "Unchaste women" were viewed as possessing psychic complexes which were " 'multifarious, distorted partly by inherent defects, partly by diseased derangements or abnormal instincts, partly by bad social environment, partly by temporary physiological or emotional conditions. One form taken by these complexes is that of contriving false charges of sexual offences [sic] by men.' " *Redmon*, 150 Neb. at 65, 33 N.W.2d at 351. Use of evidence of a victim's past sexual behavior is now appropriately limited. Neb. Rev. Stat. §§ 27-404 and 28-321 (Reissue 1995).

A victim is no longer required to " 'resist to the utmost with the most vehement exercise of every physical means or faculty naturally within her power to prevent carnal knowledge, and she must persist in such resistance as long as she has the power to do so until the offense is consummated.' " *Prokop v. State*, 148 Neb. 582, 587, 28 N.W.2d 200, 203 (1947).

REVERSED AND REMANDED FOR A NEW TRIAL.

CONNOLLY, J., concurring.

While I concur in the result reached by the plurality opinion, I disagree with the reasoning touching on the consent issue.

Reavis claims that her consent was ineffectual because she was abused as a child, more than 20 years before the alleged

incident in the instant case. Reavis offered the testimony of Drs. Moore and Sime to show that the abuse she suffered as a child made her incapable of giving consent in the instant case. As the plurality characterizes Dr. Sime's testimony, it was as a result of her childhood sexual abuse that Reavis would have difficulty saying no and enforcing her refusal. Dr. Moore testified that she had difficulty saying no and meaning it.

While the testimony of Drs. Sime and Moore may support a conclusion that Reavis suffered some type of dysfunction as a result of her abuse, it does not support a conclusion that she lacked the legal capacity to consent. On the issue of legal capacity, in their treatise on the law of torts, Prosser and Keeton say "[t]he abnormality [suffered by the consenting person] *must substantially impair the plaintiff's capacity to understand and weigh the harm and risks of harm against the benefits flowing from the proposed conduct*, and must reduce that capacity below the level of the average person." (Emphasis supplied.) W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 18 at 114-15 (5th ed. 1984). Drs. Sime and Moore did not testify that Reavis' prior sexual abuse impaired her ability to understand the consequences of sexual intercourse or that it impaired her ability to weigh the harm and risks of harm of engaging in sexual intercourse against the benefits—they merely testified that she cannot say no.

Thus, the abuse that Reavis suffered as a child is not relevant to the issue of whether she consented on the afternoon of December 31, 1991. Therefore, the district court erred in receiving the testimony of Drs. Sime and Moore on the issue of Reavis' alleged lack of legal capacity to consent to sexual intercourse.

GERRARD, J., joins in this concurrence.

GERRARD, J., concurring in part, and in part dissenting.

I agree that Slominski is entitled to a new trial for the reasons set forth in the concurrence of Justice Connolly. The testimony of Drs. Sime and Moore does not support a claim that Reavis' dysfunction from her childhood abuse rose to the level that substantially impaired her capacity to give "effective con-

sent" under the circumstances. Thus, the abuse that Reavis suffered as a child is not relevant unless the resultant dysfunction from the abuse substantially impaired Reavis' capacity "to understand and weigh the harm and risks of harm against the benefits flowing from the proposed [sexual contact]." W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 18 at 115 (5th ed. 1984). Since the expert testimony did not link the childhood abuse to a lack of capacity on Reavis' part to render "effective consent," the district court erred in receiving testimony regarding the abuse that Reavis suffered as a child for the purpose for which it was offered.

However, I write separately to express my views regarding the two jury instructions tacitly approved by the plurality in the event of a retrial. Slominski's proposed instruction No. 3 states:

> One who has reached the age of majority can give an effective consent to all kinds of conduct unless the defendant knows of some kind of abnormality, temporary or permanent, on the part of the consenting person. The abnormality must substantially impair the plaintiff's capacity to understand and weigh the harm and risks of harm against the benefits flowing from the proposed conduct, and the abnormality must reduce her capacity to consent below the level of the average person. The defendant must have knowledge of the abnormality at the time of the alleged act.

While this instruction correctly reflects the position of the Restatement (Second) of Torts § 892 A(2)(a), comment *b.* (1979), it is to be given only in the event that Reavis adduces relevant evidence that her consent, whether actual or apparent, was not "effective" because of some kind of abnormality on her part.

Slominski's tendered instruction No. 4 is also aimed at the effectiveness of one's consent. "Consent is not effective if it is given under duress." The Restatement, *supra*, § 892 B(3) at 370. See, also, W. Page Keeton et al., *supra*, § 18. Proposed instruction No. 4 states, "A threat of economic duress such as the threat of a future loss of employment is not sufficient to invalidate the consent given." I dissent from that portion of the

plurality opinion that approves Slominski's tendered instruction No. 4, because I am not willing to perpetuate the fiction that the threat from an employer of loss of future employment is *never* sufficient to invalidate apparent consent to sexual contact by an employee.

This case is a classic example of those cases in Nebraska wherein an employee is without recourse to file a claim of sexual harassment under title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (1988), or the Nebraska Fair Employment Practice Act, Neb. Rev. Stat. § 48-1101 et seq. (Reissue 1993), because the employer does not employ the requisite 15 or more employees to be considered "an employer" under either act. See, 42 U.S.C. § 2000e(b); § 48-1102(2). Therefore, the employee who alleges that the employer is making unwanted physical contact of a sexual nature is left with a claim for civil battery or, in some instances, intentional infliction of emotional distress. The Catch-22 is readily apparent as illustrated by the facts of this case.

Employee claims battery—unwanted physical touching of the employee by employer. Employer claims that the physical contact was consensual—stating to her, "You know you want it." Employee claims that if she did not comply with employer's sexual requests, she would not have a job. Employer claims he did not specifically threaten to fire employee, although employee stated that employer said employee would lose her job and her marriage if she told anyone. Regardless of the nature or extent of the threat, employer requests that the jury be instructed to ignore the threat of a future loss of employment. The employer urges that such a threat, whether direct or indirect, does not invalidate employee's apparent consent to the employer's demand for sex.

Although the plurality's approval of proposed instruction No. 4 is supported to some degree by cases from other jurisdictions and the Restatement, *supra*, § 892 B, comment *j.*, the circumstances of this case are different, and the realities of the workplace call for further analysis. The plurality's analysis does not take into account society's increasing intolerance of workplace harassment or the growing recognition of the cen-

trality of work in a person's life and the fact that "[f]or most employees, their job is the most valuable thing they possess . . . ." Clyde W. Summers, *Individual Protection Against Unjust Dismissal: Time for a Statute*, 62 Va. L. Rev. 481, 532 (1976). See *Foley v. Polaroid Corp.*, 400 Mass. 82, 508 N.E.2d 72 (1987) (Liacos, J., concurring in part and dissenting in part).

The U.S. Supreme Court has stated that "[i]t requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure." *Truax v. Raich*, 239 U.S. 33, 41, 36 S. Ct. 7, 60 L. Ed. 131 (1915).

As Justice Douglas put it, "it does a man little good to stay alive and free and propertied, if he cannot work." *Barsky v. Board of Regents*, 347 U.S. 442, 473, 74 S. Ct. 650, 98 L. Ed. 829 (1954) (Douglas, J., dissenting). Justice Douglas wrote:

> The right to work, I had assumed, was the most precious liberty that man possesses. Man has indeed as much right to work as he has to live, to be free, to own property. The American ideal was stated by Emerson in his essay on *Politics*, "A man has a right to be employed, to be trusted, to be loved, to be revered." . . . To work means to eat. It also means to live. . . . The great values of freedom are in the opportunities afforded man to press to new horizons, to pit his strength against the forces of nature, to match skills with his fellow man.

347 U.S. at 472 (Douglas, J., dissenting).

It is difficult to overstate the importance of the employment relationship as a focus of security and standing in our society.

> The growing recognition of the centrality of work in a person's life, together with an awareness of the severe economic consequences resulting from arbitrary treatment in the employment relationship, supports [the] assertion that employer control over the job means that "the substance of life is in another man's hands."

J. Peter Shapiro & James F. Tune, Note, *Implied Contract Rights to Job Security*, 26 Stan. L. Rev. 335, 339 (1974). In my view, the threat of physical force is oftentimes no more sig-

nificant than the threat of losing one's employment or career as an invalidation of the alleged consent to sexual contact for purposes of this tort.

In the instant case, Reavis' employment options were extremely limited in Falls City, Nebraska. Reavis stated that she could not quit her job because she needed the money to support her family, and this was a high-paying job in Falls City. Reavis repeatedly testified that she was reluctant to refuse Slominski's advances because she needed to work. To approve Slominski's proposed instruction No. 4, in light of the facts of this case, would fly in the face of the public policy of this state. See Nebraska Fair Employment Practice Act, § 48-1101. Given the employment policy of this state, it is difficult to reconcile the position of one of the dissents that the facts of this case could possibly constitute sexual harassment, but not sexual assault.

Under the circumstances, the district court's instruction No. 11, derived from the Restatement (Second) of Torts § 892 (1979), is an accurate and complete statement of the law of consent. Instruction No. 11 states:

> Consent is willingness in fact or conduct to occur. It may be manifested by action or inaction and need not be communicated to the actor.
>
> If words or conduct are *reasonably understood by another* to be intended as consent, they constitute apparent consent and are as effective as consent in fact.
>
> A manifestation of consent, *upon which the defendant may reasonably rely*, will be equally effective even though there is no willingness in fact. The defendant is entitled to rely upon what any reasonable person would understand from the plaintiff's conduct.

(Emphasis supplied.)

This instruction describes both actual consent and apparent consent, and distributes the risk equally between two adults that have engaged in sexual contact. Party A, claiming lack of consent, is always subjected to the risk that a jury will find his or her conduct was reasonably understood by party B to be consent to sexual contact. Party B, claiming that party A consented to sexual contact, is likewise at risk that a jury will find that it was not *reasonable* for him or her to assume that party

A's conduct constituted actual or apparent consent. In other words, given the context of a significant history of sexual advances by party B, threats of employment discharge, and various forms of rejection by party A, a jury may or may not find party B's assumption of consent to sex by party A to be *reasonable* under the circumstances. Therefore, a correct application of the law allows the fact finder to determine whether there is (1) no liability because of sexual contact between two *consenting* adults, or (2) liability on the part of an individual who fails to comprehend the meaning of the word "no."

Accordingly, while I agree that Reavis' claim for civil battery should be remanded for a new trial, I do not join the plurality's tacit approval of an instruction stating that the threat of losing one's employment may never invalidate any alleged consent given under these circumstances. This is particularly so when the alleged consent is deemed to be ambiguous or equivocal. In sex at the workplace scenarios, a threat of loss of employment is rarely made without the accompanying litany of sexual overtures and unwanted touchings. A jury is most capable of making a determination of the effectiveness of a party's alleged consent when properly instructed and allowed to consider all relevant factors in their proper context.

WHITE, C.J., joins in this concurrence and dissent.

CAPORALE, J., dissenting.

I must respectfully dissent. However, in doing so, I wish to begin by noting my agreement with the plurality on several points.

Although the plurality does not deal separately with the district court's overruling of the motion for directed verdict made by the defendant-appellant and cross-appellee, James Slominski, D.D.S., at the close of the evidence presented by the plaintiff-appellee and cross-appellant, Mary Reavis, I agree that Slominski cannot successfully predicate error on that ruling, for by adducing evidence after the ruling, he waived any error such ruling may have created. See *Farmers and Merchants Bank v. Grams, ante* p. 191, 548 N.W.2d 764 (1996). I agree, too, that the theory of recovery at issue is one for battery, not assault, and that the Restatement (Second) of

Torts § 892 (1979) accurately states the law of consent in Nebraska. I also agree that consent can be rendered ineffective if the person consenting lacks the legal capacity to do so or if the person was coerced into consenting. W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 18 (5th ed. 1984).

Having reviewed all of that, I recall that Slominski does not deny that he engaged in sexual intercourse with Reavis, but, rather, contends that the contact was consensual. Although, so far as the record shows, Reavis did not file a reply denying that assertion, she presented, and the trial court received, evidence attempting to prove that she did not consent to sexual contact with Slominski or, as an alternative, that any consent she gave was not effective because she either lacked the legal capacity to consent to sexual intercourse or was coerced by Slominski into consenting.

In support of her claim that she lacked the legal capacity to consent to sexual intercourse, Reavis introduced the testimony of Dr. Wesley Sime, a counseling psychologist, as follows:

Q . . . Can you explain why — why [Reavis'] childhood experiences could hamper her in the ability to say no to . . . Slominski?

. . . .

A When you've been abused as a child in a way where you cannot escape, so to speak, and where there's a circumstance where if you protest too vigorously, if you fight back, you get punished or hurt more so, then it makes it difficult for a person as an adult to take the risk of making a huge and a — a — a outlandish kind of a cry out.

. . . .

Q . . . And based on all that and your experience, do you have an opinion with a reasonable degree of psychological certainty, whether or not . . . Reavis could consent to . . . Slominski's sexual advances?

. . . .

A My opinion is that consent is — consists of a yes or no. It consists of an attempt or a gesture to express one's feelings about a situation. And that in this situation her

ability to consent and carry out the consent or not consent was compromised by the circumstances.

. . . .

Q And can you be more specific about what circumstances prevented [Reavis] from — from enforcing the no that she told him?

. . . .

Q . . . The question is you understand that [Reavis] said no to . . . Slominski at least twice, according to her testimony, on the 31st. Correct?

A That's correct.

Q What prevented her from crying out for help or from enforcing the no?

. . . .

A Well, there's probably at least two variables here. Number one is she was isolated in an area with him. The door was locked, which was an implied threat. And secondarily, the fact that she has suffered previous trauma in association with the crying out experience or making a — making a huge appeal, would make it difficult for a person to make that a public kind of a[n] appeal.

. . . .

Q And you've heard testimony where [Reavis] has said to . . . Slominski I was able to say no at some times.

A Yes.

Q And other times I was not.

A Yes.

Q What's the difference?

A It's a situational refusal. In other words, it's — it's easier to say no when there are other people at least in the vicinity where it would be difficult to carry out something that is kind of questionable of nature. When you're isolated, that's a situationally difficult situation to refuse and to enforce a refusal.

In further support of her claim of incapacity, Reavis also presented the testimony of Dr. Y. Scott Moore, her treating psychiatrist. Moore testified to the following:

Q Based on your examination of . . . Reavis, your review of the hospital records, your experience, your

training, do you have an opinion with any degree — with a degree of reasonable . . . . A reasonable degree of medical certainty, whether or not . . . Reavis could have consented to have sex with her boss on December 31, 1991?

. . . .

[A] Yes.

Q What is that opinion?

. . . .

[A] Yes, I believe that . . . Reavis was in the same position then that she'd always been in which she had the inability to refuse him. I think she felt that her job depended upon having sex with him, and that she had no recourse.

Slominski countered by testifying that he had no knowledge of Reavis' abusive childhood and that he did not know that she was in any way mentally disturbed. He argues that the district court thus erred in admitting the evidence regarding Reavis' alleged lack of capacity to consent to sexual intercourse and that the error prejudiced him.

The most that Sime's and Moore's testimony shows is that due to Reavis' abusive childhood, she might fear protesting too vigorously; that because she was isolated and the door was locked, she would have difficulty saying no and enforcing her refusal; and that she felt unable to refuse Slominski because she felt her job depended on having sex with him.

As I understand it, the test for legal capacity depends upon the state of one's knowledge, not upon the exercise of one's will. Like many other tests, it merely requires one to understand and appreciate the nature and consequences of the act at issue. Therefore, one has testamentary capacity if one understands the nature of one's act in making a will or codicil thereto, knows the nature and extent of one's property, knows and understands the proposed disposition of one's property, and knows the natural object of one's bounty. *In re Estate of Wagner*, 246 Neb. 625, 522 N.W.2d 159 (1994); *In re Estate of Peterson*, 232 Neb. 105, 439 N.W.2d 516 (1989). Similarly, one has the legal capacity to marry if one has sufficient capacity to understand the nature of the marital contract and the

obligations and responsibilities it creates. *Edmunds v. Edwards*, 205 Neb. 255, 287 N.W.2d 420 (1980); *Fischer v. Adams*, 151 Neb. 512, 38 N.W.2d 337 (1949).

Although we have not heretofore addressed the issue of capacity to consent with respect to sexual intercourse, other jurisdictions have concluded that one has such capacity if one understands and appreciates the nature of the act of sexual intercourse, its character, and the probable or natural consequences which may attend it. *State v. Johnson*, 155 Ariz. 23, 745 P.2d 81 (1987); *Salsman v. Com.*, 565 S.W.2d 638 (Ky. App. 1978); *Stephenson v. State*, 35 Ala. App. 379, 48 So. 2d 255 (1950), *cert. denied* 254 Ala. 313, 48 So. 2d 259; *People v. Boggs*, 107 Cal. App. 492, 290 P. 618 (1930); *People v. Blunt*, 65 Ill. App. 2d 268, 212 N.E.2d 719 (1965). See, also, Annot., Rape or Similar Offense Based on Intercourse With Woman Who Is Allegedly Mentally Deficient, 31 A.L.R.3d 1227 (1970). Therefore, the proper inquiry in this case is whether Reavis' "mental disorder was an impairment of such a degree that it precluded the victim from understanding the act of intercourse and its possible consequences." *Johnson*, 155 Ariz. at 26, 745 P.2d at 84.

The evidence in this case falls far short of the test. There is absolutely no evidence that Reavis did not understand and appreciate the nature of the act of sexual intercourse, its character, and the probable or natural consequences which may attend it. By all accounts, Reavis was a mature woman who had substantial sexual experience. Not only was she married and the mother of four children, she had previously engaged in a sexual relationship with Slominski. Moreover, there is no evidence that Reavis was in any way subnormal in intelligence or deficient in her ability to understand things. In fact, the evidence at trial shows quite the opposite. It shows that Reavis was a very capable employee who was instrumental in introducing new business practices to improve the profitability of her workplace.

In sum, there is no factual foundation for the opinion evidence that Reavis lacked the capacity to consent, because the facts relied upon by the witnesses in reaching that conclusion do not relate to the applicable legal test. See, *Priest v.*

*McConnell*, 219 Neb. 328, 363 N.W.2d 173 (1985) (factual basis lacking for opinion that witness had confabulated); *Dawson v. Papio Nat. Resources Dist.*, 206 Neb. 225, 292 N.W.2d 42 (1980) (opinions based on unproven assumption inadmissible). Moreover, admission of the opinion evidence was prejudicial, for it permitted the jury to improperly speculate that Reavis lacked the legal capacity to consent to sexual intercourse.

The plurality's view that this dissent recasts the posture of this case and supplements the arguments made in Slominski's brief overlooks that Slominski's brief explicitly argues "it was completely irrelevant whether Reavis' capacity to give consent was hampered somehow by her prior abuse as a child when she verbally and by her actions consented to have sex with Slominski." Brief for appellant at 22. No matter how inartfully the issue may have been raised at trial by Slominski, the question of the proper legal standard to govern claims of incapacity to consent to sexual intercourse was before the trial court and is before this court. With regard to such questions of law, we have an obligation to come to an independent conclusion. *Welch v. Welch*, 246 Neb. 435, 519 N.W.2d 262 (1994); *Duggan v. Beermann*, 245 Neb. 907, 515 N.W.2d 788 (1994).

It appears that the reason the plurality believes this dissent recasts the posture of this case is that the plurality understands Slominski to have raised the issue of incapacity only as it relates to Reavis' failure to prove that Slominski had any knowledge of her alleged incapacity. But I respectfully submit that the issue of Slominski's knowledge of Reavis' incapacity is intimately related to the legal standard for capacity to consent.

The general rule is that "one who has reached the age of majority can give an effective consent to all kinds of conduct unless the defendant knows or has reason to know of some kind of abnormality, temporary or permanent, of the consenting person." W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 18 at 114 (5th ed. 1984). The type of abnormality which is contemplated as negating consent is that which renders one mentally incapable of giving consent. Thus, in

determining whether one gave effective consent to sexual intercourse, the inquiry is twofold: First, did the person understand and appreciate the nature of the act of sexual intercourse, its character, and the probable or natural consequences which may attend it? If the person did not, we then must ask whether the defendant had real or constructive knowledge of the victim's incapacity. If the defendant was ignorant of the victim's incapacity, then no liability attaches.

Thus, in a case of otherwise effective consent, liability can be avoided upon proof that the victim had the capacity to consent or upon proof that the defendant was ignorant of the victim's incapacity.

In a related matter, I cannot agree with the plurality's conclusion that the "relevancy of Reavis' evidence regarding her incapacity hinged on proof that Slominski knew or had reason to know of the incapacity." This is simply not so. As noted earlier, evidence of incapacity is relevant in its own right to the issue of effectiveness of consent and is not dependent on a showing that the defendant had knowledge of the victim's incapacity. Once it is understood that the two issues are interrelated but separate, it becomes apparent that the plurality has erred in applying the rules governing the conditional admittance of evidence. Those rules apply only "[w]hen the relevancy of evidence depends upon the fulfillment of a condition of fact . . . ." Neb. Rev. Stat. § 27-104(2) (Reissue 1995). See, also, 1 McCormick on Evidence § 58 (John W. Strong 4th ed. 1992). That condition does not obtain here, since evidence concerning capacity is relevant in its own right and not dependent on the fulfillment of a condition.

As a result of applying the wrong evidentiary rule, the plurality chastises Slominski for not seeking a conditional admittance of Reavis' proffered evidence and failing to move to strike it. The plurality then reasons that Slominski has waived his right to assert prejudicial error on appeal because he failed to make a timely objection. But I am aware of no rule of evidence in our adversarial system which requires an advocate to request that an opponent's evidence be admitted conditionally; it is the proponent of the proffered evidence who must seek the conditional admittance of that evidence. Nor can it be

maintained that Slominski was under an obligation to move to strike the evidence, since, as explained previously, the rules for the conditional admittance of evidence do not apply here. I must also disagree with the plurality's determination that Slominski did not preserve this issue on appeal. By raising a timely objection to Reavis' evidence of incapacity, Slominski did all that was required to preserve the issue.

Having set out the appropriate legal standard for determining capacity to consent and identifying the crux of my disagreement with the plurality on the issues in this case, I now turn to comment on the substantive legal standard adopted by the plurality and its analysis.

The plurality imports into the realm of tort law the legal concepts contained within our criminal sexual assault statutes. Neb. Rev. Stat. §§ 28-319 and 28-320 (Reissue 1995). This, I respectfully suggest, is imprudent.

Under both §§ 28-319 and 28-320, sexual assault can be proved without the consent of the victim if the perpetrator "knew or should have known that the victim was physically or mentally incapable of resisting or appraising the nature of his or her conduct." This phrase embodies both the concept of duress and the concept of incapacity. Given the complexity of these issues, it seems most unwise to confuse the legal concepts by adopting a unified standard. As the plurality itself notes, the jury in this case would have benefited by being instructed to reach its decision through a step-by-step analysis.

The plurality rightly points out that its concept of capacity to consent is much broader than the one other jurisdictions have adopted. Under the plurality's analysis, one lacks the capacity to consent if one is "physically and mentally incapable of resisting." But this deprives capacity of its legal meaning. For example, consider the case of a person who is sexually assaulted and is physically incapable of resisting. This person's consent is ineffective not because she or he lacks the capacity to consent, but, rather, because the use or threat of force vitiates any consent that she or he might give. The other half of the formulation relates to those "mentally incapable of resisting." This is essentially a standard which relies upon the exercise of one's will. Such standards are commonly criticized

on the basis that they lead to mistakes because, as noted by a respected panel of psychiatrists speaking for the American Psychiatric Association, "[t]he line between an irresistible impulse and an impulse not resisted is probably no sharper than that between twilight and dusk." Insanity Defense Work Group, American Psychiatric Association Statement on the Insanity Defense, 140 Am. J. Psychiatry 681, 685 (1983). The problem is not that mental health professionals do not know where to locate an appropriate cutoff point in the strength of impulses, or in this case the mental capability to resist; rather, the problem is that mental health professionals have no good way to gauge the strength of such internal impulses at all. Because of the difficulties of proof, I would not adopt a standard relying on the exercise of will as the law governing the capacity to consent.

Be that as it may, the analysis made herein regarding the evidence of capacity in this case is correct even under the exercise of will test adopted by the plurality. The expert testimony that Reavis felt unable to refuse Slominski because she felt her job depended on having sex with him is cited by the plurality as having undermined Reavis' capacity to consent and as a form of duress. But this type of testimony is irrelevant to both capacity and duress. It is a well-settled proposition of law that economic duress such as a threat of loss of employment is not sufficient to invalidate consent. See W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 18 (5th ed. 1984). See, also, *Foley v. Polaroid Corp.*, 400 Mass. 82, 508 N.E.2d 72 (1987) (threats of discharge from employment not sufficient to invalidate consent that contradicts false imprisonment); *Faniel v. Chesapeake & Potomac Telephone Co.*, 404 A.2d 147 (D.C. App. 1979) (fear of losing one's job, although powerful incentive, does not render involuntary the behavior induced). Thus, although Reavis' fear of losing her job might have been a powerful incentive, it did not affect her capacity to consent or constitute a form of duress as a matter of law. Whether such a fear would be sufficient to support a claim of sexual harassment under title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1) (1988), or the Nebraska Fair Employment Practice Act, Neb. Rev. Stat. § 48-1101 et seq.

(Reissue 1993), is a different question; but this is not such a case.

Other expert testimony that the circumstances of being isolated and behind a locked door compromised Reavis' ability to withhold consent does not show that Reavis was incapable of consenting or resisting. It is therefore irrelevant to the issue of capacity. As an implied threat, it more properly belongs in the category of duress or coercion.

This leaves only the testimony that Reavis might fear protesting too vigorously because of her abusive childhood. That testimony, even when construed in the light most favorable to Reavis, falls far short of showing that Reavis was "mentally incapable of resisting." The most it shows is that because of her abusive childhood, it would be more difficult for Reavis to protest vigorously. There are simply no facts in evidence which would support an opinion that Reavis was "mentally incapable of resisting."

Because the facts relied upon by the witnesses in reaching that conclusion do not relate to the plurality's legal test, I have to conclude that there is no factual foundation for the opinion evidence that Reavis lacked the capacity to consent.

Having reviewed the law of consent, I move on to the question of whether the facts are such that as a matter of law, Reavis effectively consented to having sexual relations with Slominski. In this regard, the plurality correctly observes that a trial court may properly direct a verdict as a matter of law only when the facts are conceded, undisputed, or such that reasonable minds could draw but one conclusion therefrom. *Nickell v. Russell*, 247 Neb. 112, 525 N.W.2d 203 (1995); *Lindsay Mfg. Co. v. Universal Surety Co.*, 246 Neb. 495, 519 N.W.2d 530 (1994); *Kozeny v. Miller*, 243 Neb. 402, 499 N.W.2d 75 (1993). Moreover, the party against whom the verdict is directed is entitled to have every controverted fact resolved in his or her favor and to have the benefit of every inference which can reasonably be drawn from the evidence. If there is any evidence which will sustain a finding for the party against whom the motion is made, the case may not be decided as a matter of law. *Nickell, supra*; *Lindsay Mfg. Co., supra*.

Under the record with which we are presented, there is no triable issue of fact on the matter of consent. How can one's disrobing and one's willing participation in sexual intercourse be considered an ambiguous indication of consent to have intercourse? The plurality has no answer, except to say that "disrobing does not necessarily indicate that [Reavis] consented to the sexual contact if the prior events indicated that she felt that she had no other choice but submission at that time." While I recognize that there could be an issue regarding whether Reavis was coerced by Slominski, that does not render Reavis' conduct an ambiguous indication of her consent.

Coercion, as noted previously, goes to the effectiveness of consent. So the ultimate question becomes whether Slominski forced Reavis to engage in sexual intercourse with him.

Reavis admitted that Slominski never physically forced her to have sex with him, and a review of the record reveals no evidence that Slominski ever threatened Reavis with physical force. Nonetheless, Reavis claims that she felt that she had no other choice but to engage in sexual intercourse with Slominski because she feared losing her job and needed the money.

As a consequence, there is no issue of fact for the jury to decide, not because Reavis was "unchaste" or "errant," and was not subjected to physical force, but because, as noted in *Schieffer v. Catholic Archdiocese of Omaha*, 244 Neb. 715, 718, 508 N.W.2d 907, 911 (1993), it is a fundamental principle of common law that " 'to one who is willing, no wrong is done.' " The district court clearly erred in not sustaining the motion for a directed verdict Slominski made at the close of all the evidence.

Accordingly, I would reverse the judgment of the district court and remand the cause for dismissal.

FAHRNBRUCH, J., joins in this dissent.

WRIGHT, J., dissenting.

I dissent. The issue in this case is whether Slominski had sexual intercourse with Reavis without her consent. The evidence was based upon the testimony of two medical doctors regarding whether Reavis lacked the legal capacity to consent

to the sexual intercourse. One doctor said that Reavis' ability to consent was "compromised by the circumstances." The rest of his testimony was equivocal, but he stated that it was easier for Reavis to refuse when there were other people around. The other doctor stated that Reavis "felt that her job depended upon having sex with [Slominski] and that she had no recourse." In my opinion, there was no basis for submitting the issue of lack of capacity to consent to the jury. A threat of loss of employment did not impair Reavis' ability to say no.

I also cannot accept the plurality's position that Slominski could have known that Reavis could not effectively give consent, because Slominski had repeatedly been able to engage in sexual contact in the past, despite Reavis' requests that he not touch her. Reavis admitted that she had previously been able to successfully refuse Slominski's advances.

In my opinion, there was a valid consent to the sexual intercourse, and the district court should have directed a verdict in favor of Slominski at the close of all of the evidence.